UNION BRIDGE COMPANY *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF PENNSYLVANIA.

No. 431. Argued December 5, 6, 1906.—Decided February 25, 1907.

Commerce comprehends navigation; and to free navigation from unreasonable obstructions by compelling the removal of bridges which are such obstructions is a legitimate exercise by Congress of its power to regulate commerce.

Congress when enacting that navigation be freed from unreasonable obstructions arising from bridges which are of insufficient height or width of span, or are otherwise defective, may, without violating the constitutional prohibition against delegation of legislative or judicial power, impose upon an executive officer the duty of ascertaining what particular cases come within the prescribed rule.

Requiring alterations to secure navigation against unreasonable obstructions is not taking private property for public use within the meaning of the Constitution; the cost of such alterations are incidental to the exercise of an undoubted function of the United States, exerting through Congress, its power to regulate commerce between the States.

Although a bridge erected over a navigable water of the United States under the authority of a state charter may have been lawful when erected and not an obstruction to commerce as then carried on, the owners erected it with knowledge of the paramount authority of Congress over navigation and subject to the power of Congress to exercise its authority to protect navigation by forbidding maintenance when it became an obstruction thereto,

The silence or inaction of Congress when individuals, acting under state authority, place unreasonable obstructions in waterways of the United States, does not cast upon the Government any obligation not to exercise its constitutional power to regulate commerce without compensating such parties.

The provisions in § 18 of the River and Harbor Act of 1899, 30 Stat. 1121, 1153, providing for the removal or alteration of bridges which are unreasonable obstructions to navigation, after the Secretary of War has, pursuant to the procedure prescribed in the act, ascertained that they are such obstructions, are not unconstitutional either as a delegation of legislative or judicial power to an executive officer or as taking of property for public use without compensation.

143 Fed. Rep. 377, affirmed.

THIS is a proceeding in the nature of a criminal information in the District Court of the United States for the Western District of Pennsylvania against the Union Bridge Company, a corporation of Pennsylvania, owning and controlling a bridge across the Allegheny River near where it joins the Monongahela River to form the Ohio River—the Allegheny River being a navigable waterway of the United States, having its source in New York and being navigable in both New York and Pennsylvania.

Stating the matter generally, the Secretary of War found the bridge to be an unreasonable obstruction to the free navigation of the Allegheny River, and required the Bridge Company to make certain changes or alterations in order that navigation be rendered reasonably free, easy and unobstructed. These alterations, it was charged, the company wilfully failed

and refused to make. Hence the present information against it. There was a verdict of guilty, followed by a motion in arrest of judgment, which motion being overruled, the company was sentenced to pay a fine of $5,000. To review that order this writ of error is prosecuted.

The information was based on section 18 of the River and Harbor Act, of March 3d, 1899, which provides: "That whenever the Secretary of War shall have reason to believe that any railroad or other bridge now constructed, or which may hereafter be constructed, over any of the navigable waterways of the United States is an unreasonable obstruction to the free navigation of such waters on account of insufficient height, width of span, or otherwise, or where there is difficulty in passing the draw opening or the draw span of such bridge by rafts, steamboats, or other water craft, it shall be the duty of the said Secretary, first giving the parties reasonable opportunity to be heard, to give notice to the persons or corporations owning or controlling such bridge so to alter the same as to render navigation through or under it reasonably free, easy, and unobstructed; and in giving such notice he shall specify the changes, recommended by Chief of Engineers, that are required to be made, and shall prescribe in each case a reasonable time in which to make them. If at the end of such time the alteration has not been made, the Secretary of War shall forthwith notify the United States district attorney for the district in which such bridge is situated, to the end that the criminal proceedings hereinafter mentioned may be taken. If the persons, corporation, or association owning or controlling any railroad or other bridge shall, after receiving notice to that effect, as hereinbefore required, from the Secretary of War, and within the time prescribed by him, wilfully fail or refuse to remove the same or to comply with the lawful order of the Secretary of War in the premises, such persons, corporation, or association shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding five thousand dollars; and every month such persons, cor-

poration, or. association shall remain in default in respect to the removal or alteration of such bridge shall be deemed a new offense, and subject the persons, corporation, or association so offending to the penalties above prescribed: *Provided,* That in any case arising under the provisions of this section an appeal or writ of error may be taken from the district courts or from the existing circuit courts direct to the Supreme Court either by the United States or by the defendants." 30 Stat. 1121, 1153, c. 425.

Legislation similar in its general character can be found in River and Harbor Acts passed at previous sessions of Congress. Act of 1884, 23 Stat. 123, 148, c. 229; Act of April 11th, 1888, 25 Stat. 400, 424, 425, c. 860, §§ 9, 10; and act of September 19th, 1890, 26 Stat. 426, 453, c. 907, §§ 4, 5. Finally, we have the act of March 23d, 1906, 34 Stat. 84, c. 1130, §§ 4, 5, which covers the same ground as the act of 1899 under which the present information was filed.

It appears that the Bridge Company was incorporated by an act of the Pennsylvania legislature, approved March 13th, 1873, with authority to construct a bridge over the Allegheny River, in the City of Allegheny. That act contains this proviso: "That the erection of said bridge shall not obstruct the navigation of said river, so as to endanger the passage of rafts, steamboats, or other water crafts; and the piers shall not be so placed as to interfere with tow-boats proceeding out with their tows made up, and shall be constructed in such manner as to meet the requisitions of the law in regard to the obstructions of navigation."

The bridge was constructed in 1874 and 1875, and has been in use since 1875.

In 1902 a petition was sent to the Secretary of War by persons, corporations and companies in and about Pittsburg, which contained, among other things, these statements: "There can be no doubt whatever that this bridge is an unreasonable obstruction to the free navigation of the Ohio, Monongahela and Allegheny Rivers on account of insufficient

height and the filling in of the river or rivers over which it passes in order to provide approaches for it. We respectfully request that you will investigate this matter, having full confidence that after making such investigation you will find it to be your duty to take action against its owners, the Union Bridge Company, under the provisions of Section 18, of the River and Harbor Act, approved March 3, A. D. 1899. . . . It was built of such a low height above the water as to cause the almost complete obstruction of all the packet and towboat trade passing from the Allegheny River into the Ohio and Monongahela rivers, and from these rivers into the Allegheny. In building it the width of the river was very materially narrowed as already stated by the fills made for the approaches. The river commerce of Pittsburg, as you are aware, is of very great magnitude and importance and is rapidly increasing in volume. For the last calendar year it amounted to 10,916,489 tons, being about equal to that of the harbor of New York. The extension of the manufacturing industries of Pittsburg up the Allegheny River is making it of much greater importance than heretofore that the navigation to and from that river should not be obstructed. The present time is peculiarly appropriate for action by you. The Union Bridge is an old wooden structure and will soon need, in fact it already needs, extensive repairs to make it safe for public use. Therefore, as the bridge in question deprives the community of a reasonable use of the Allegheny River in connection with the river business of this great harbor, we appeal to you to exercise the powers committed to you to abate or to at least mitigate this great public nuisance as you shall find yourself justified by the law and the facts of the case."

The matter was referred by the Secretary of War to the proper officers of the Engineer Corps of the Army for examination and report. Such examination was had upon notice to the Bridge Company, and under date of December 8th, 1902, Captain Sibert, captain of engineers, who conducted the examination, reported and recommended to the Chief of En-

gineers that the company be given notice to make certain alterations in its bridge.

On December 16th, 1902, the Chief of Engineers transmitted that report to the Secretary of War, saying: "As required by the law and the instructions of the War Department, a public hearing has been held, after due advertisement, and all interested parties have been afforded an opportunity to present their views. Attention is respectfully invited to the accompanying report on the subject, dated the 8th instant, by Captain Sibert, and to its accompanying papers. In this report Captain Sibert fully discusses all phases of the question and shows that, without reference to the use of the Allegheny River for through navigation, the bridge in question is an unreasonable obstruction, and practically a bar to the use of that portion of Pittsburg Harbor situated on the river. He states that none of the boats engaged in interstate commerce from Pittsburg, south and west, can reach, at low water, a single manufacturing plant or wharf in the cities of Pittsburg and Allegheny on the Allegheny River. He submits a photograph to show that the portion of Pittsburg Harbor in the Monongahela River is crowded with shipping while that portion in the Allegheny has none, all due to the existence of the Union Bridge. It is also shown by the evidence that the lower portion of the Allegheny River would be of great importance as a harbor of refuge when ice is running out of the Monongahela River, if it were not obstructed by the Union Bridge. He reaches the conclusion, based on the facts developed at the hearing, that in order to give the shipping at Pittsburg increased harbor room and to enable it to connect with wharves and manufacturing plants in that part of the harbor located on the Allegheny River, the Union Bridge should be so raised as to provide a channel-span with a clear height of 70 feet, the same as exists under the bridge known as the 'Point Bridge' on the Monongahela River, and the same that will exist under the Wabash Railroad bridge just being built immediately above the Point Bridge. It appears that this

bridge was built in 1873–4 by the Union Bridge Company, incorporated under authority of an act of the Pennsylvania legislature of March 13, 1873, and that it has been the subject of complaint on the part of the navigation interests practically ever since its completion. Numerous investigations have been made by different engineer officers, who have held public hearings on the subject, and who have concurred in expressing the opinion that the bridge was an unreasonable obstruction to navigation, and that it should be raised so as to give a headroom equal at least to that of the aforesaid Point Bridge at the mouth of the Monongahela River. The Union Bridge is situated at the mouth of the Allegheny River, and there seems to be no room for doubt that the alteration of the bridge is essential to the reasonable use for navigation and commercial purposes of that portion of the river forming a part of Pittsburg Harbor. Captain Sibert recommends that the bridge in question be so altered as to give two navigable spans extending riverward from the left abutment, of not less than 394 feet clear width each; the second span from the Pittsburg shore to give a clear headroom over the Davis Island Pool of not less than 70 feet; and the first span from the same shore to give a headroom of not less than 70 feet at the pier and 62 feet at the abutment; also that the piers of the altered structure shall have no riprapping or other pier protection above an elevation of 10 feet below the surface of Davis Island Pool; and that all parts of the old structure not comprised in the new construction and in conformity with the above requirements shall be wholly removed. The period of 18 months is considered by him ample time within which to make these alterations. I concur in his views and recommend that notice be served on the bridge company, requiring the alterations to be made and completed as specified by him."

Under date of twentieth of January, 1903, Mr. Root, then Secretary of War, issued a formal notice to the Bridge Company stating that he had good reason to believe that its bridge was an unreasonable obstruction to free navigation. The

notice informed the company of the alterations of its bridge recommended by the Chief of Engineers as necessary, and concluded: "And whereas, eighteen months from the date of service of this notice is a reasonable time in which to alter the said bridge as described above; Now, therefore, in obedience to, and by virtue of, section eighteen of an act of the Congress of the United States entitled 'An Act making appropriations for the construction, repair and preservation of certain public works on rivers and harbors, and for other purposes,' approved March 3, 1899, I, Elihu Root, Secretary of War, do hereby notify the said Union Bridge Company to alter the said bridge as described above, and prescribe that said alterations shall be made and completed on or before the expiration of eighteen months from the date of service hereof."

As the request of the Bridge Company, the time fixed by Secretary Root for altering, changing and elevating the bridge was extended by his successor, Secretary Taft, to December 1st, 1904. By order of the latter officer the time was extended to January 1st, 1905.

Subsequently, a rehearing was asked for by the Bridge Company, but the rehearing was refused and Secretary Taft made the following order: "The Union Bridge is an unreasonable obstruction to commerce of the Allegheny River. If the bridge were not there, the winter refuge which the stretch of the Allegheny River up to the next bridge would offer for the fleet of boats, which usually are moored in the Monongahela, would be a very great advantage for navigation and commerce on the Ohio River and its tributaries. The two rivers, the Allegheny and the Monongahela, because they rise in different sections of the country, have their ice breaks at different times in the early spring. The mouth of the one offers very desirable refuge to the vessels that are exposed to danger from the breaking up of ice in the headwaters of the other. The Union Bridge at the mouth of the Allegheny was erected at a time when the Secretary of War was not given specific control over navigable streams, and was not authorized

to inhibit the construction of bridges which were likely to obstruct navigation, but it appears that an army engineer, Colonel Merrill, in charge of the District, publicly announced that this bridge was an obstruction to navigation when it was erected. It was erected, therefore, in the face of the information given by the best authority that could be consulted in that matter in the Government. These are the facts that I find independently of any previous adjudication; but added to this, is the finding of my predecessor, Mr. Root, to exactly the same effect, upon which he based an order that the bridge as an obstruction to navigation be abated. This matter is now before me on a petition for rehearing of Mr. Root's order. As an original question I should have ruled as Mr. Root ruled, and a fortiori, because the orders of this Department are not to be lightly set aside, and are to be treated as a decree in equity would be and be set aside only, upon a showing of a palpable error or mistake. The petition for rehearing is denied, and the order suspending the operation of Mr. Root's order is now revoked. The order will be put in full force and executed by the proper officers and the Union Bridge will be notified accordingly."

In the opinion of the District Court, delivered on a motion in arrest of judgment, it was said: "The obstruction here involved consists of a bridge over the Allegheny River just above its junction with the Monongahela at Pittsburg. The Allegheny River rises in Pennsylvania, flows north into New York State and thence back into Pennsylvania. The latter State, by act of March 21, 1798, enacted the Allegheny, from the New York State line to its mouth, a navigable stream, and the State of New York, by act of March 31, 1807, did likewise in its counties of Genesee and Allegheny. The Allegheny is the principal branch of the Ohio, its volume being six times greater than that of the Monongahela. It is included in the general plan for the improvement by the National Government of local interstate water ways and the harbor of Pittsburg. The Government has built or has now in process of construction

a system of locks and dams on the Allegheny which will slack-water the stream for twenty-seven miles from its mouth. The Davis Island Dam, situate five miles below Pittsburg on the Ohio River, raises the water in the Allegheny and Monongahela at their junction six feet above their normal depths and backs its water to the first dams of the Allegheny and Monongahela slackwater systems respectively. These waters form the harbor of Pittsburg, the importance of which harbor will be appreciated from the fact that the tonnage in water transportation passing from it the past year exceeded that of the Suez Canal for the same period. From its size, interstate relation and its being a part of this really great harbor, it will be seen that the Allegheny answers the requirement of a navigable stream, *The Montello,* 11 Wall. 411, and is also one over which the National Government has assumed jurisdiction. The Union Bridge is a pier-supported, wooden structure; it crosses from Pittsburg to Allegheny City; and is the first bridge on the Allegheny."

*Mr. D. T. Watson* and *Mr. Johns McCleave,* with whom *Mr. John S. Wendt* and *Mr. W. B. Rodgers* were on the brief, for plaintiff in error:

The Union Bridge located in Pennsylvania and spanning the Allegheny River from Pittsburg to Allegheny City, erected in 1874, prior to any legislation by Congress, and under an act of Pennsylvania, approved August 17, 1873, p. 86, and ever since maintained and used as a public traffic bridge, collecting tolls for use of the same, was when the present proceedings were instituted by the Secretary of War and when he made his order of January 20, 1906, for the alteration of said bridge, a lawful structure and the private property of the Union Bridge Company. *People* v. *Rensselaer R. R. Co.,* 15 Wend. 113; *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 2; *Lake Shore Company* v. *Ohio,* 165 U. S. 365; *Gilman* v. *Philadelphia,* 3 Wall. 713; *Monongahela Nav. Co.* v. *United States,* 148 U. S. 325.

As to what legislation of Congress is necessary to evince a determination of Congress to exercise its jurisdiction over any given river, see *Gilman* v. *Philadelphia*, 3 Wall. 727; *The Wheeling Bridge Case*, 13 How. 630; *Lake Shore, Co.* v. *Ohio*, 165 U. S. 365.

As Congress had not legislated and assumed jurisdiction of the Allegheny River prior to 1875, the absence of such legislation was really affirmative action by Congress that the State might freely legislate on the subject of the erection of bridges across the streams within its borders. *Mobile* v. *Kimball*, 102 U. S. 697.

The Government offered no evidence to show that the bridge was not constructed in accordance with its charter, or as constructed was, as a fact, an unreasonable obstruction to navigation, and the fact that the State of Pennsylvania, which granted the charter, had for over thirty years acquiesced in the construction of the bridge and in the bridge as constructed, and had made no objection whatever to it, is conclusive in the Federal court that the bridge was lawfully constructed. *Willamette Iron Bridge Co.* v. *Hatch*, 125 U. S. 2.

The Union Bridge when erected in 1874 was a lawful structure. It was directly authorized by the State of Pennsylvania and approved of by that State acquiescing in its construction for over thirty years. It was indirectly, but affirmatively authorized by the United States Government because that Government by its inaction as to the Allegheny River authorized affirmative action by the State of Pennsylvania in the erection of bridges over that river.

The state or the Federal Government, no more than the individual can foresee the future and tell how in the future years the bridge will affect navigation under it. Both governments act as the individual does under the circumstances surrounding him or it, and if either the state or the Federal Government authorizes the erection of the bridge in a certain way, or approves by acquiescence of a bridge in a certain way the bridge becomes a lawful structure. It is always a ques-

tion of discretion in the State or the United States, and especially if both approved the bridge as a lawful structure. This has been ruled by this court in a number of cases. *Wheeling Bridge Case,* 13 How. 518; *S. C.,* 18 How. 421; *Bridge Co. v. United States,* 105 U. S. 470.

As the bridge was then erected under state authority with the consent of the United States Government, it became and was the private property of the Union Bridge Company, and not even the United States Government claiming its sovereign right under the commerce clause could take that bridge for public use, without due compensation, or deprive the Union Bridge Company of it without due process of law. *Monongahela Nav. Co. v. United States,* 148 U. S. 312.

The right of the State and the city was sustained in the Supreme Court of Illinois as a state question. *West Chicago Street Ry. Co. v. People,* 214 Illinois, 9; *C., B. & Q. Ry. Co. v. People,* 212 Illinois, 103.

The present case comes under another class of cases, and among them are the following. *United States v. Lynah,* 188 U. S. 445; *Monongahela Navigation Co. v. United States,* 148 U. S. 312; *Transportation Co. v. Chicago,* 99 U. S. 635; *Scranton v. Wheeler,* 179 U. S. 146; *Yates v. Milwaukee,* 10 Wall. 497.

The power of Congress to regulate commerce is restricted by the provision of the Federal Constitution that private property shall not be taken for public use without just compensation, nor deprive one of property, without due process of law. No power is given to any Department of the United States Government to destroy private property without giving the owner an opportunity to be heard on the question as to whether it is or is not a nuisance or subject to such destruction. Admitting for the sake of argument that Congress might decree by an explicit and express act, any bridge over any river a nuisance and an unlawful obstruction, it is submitted that before Congress could carry into effect that judgment the owner of the property has a right to be heard on the question whether as a fact it is a nuisance and interferes with navi-

gation. Unless as a fact it is such a nuisance and interference, even Congress cannot destroy it and remove it without compensation. *Sinking Fund Cases*, 99 U. S. 718; *Murray v. Land & Improvement Co.*, 18 How. 272.

The question whether the Union Bridge is an unreasonable obstruction to navigation which makes it a nuisance, is a judicial one which entitles the Bridge Company to a hearing on the merits before it can be deprived of its life. *Commonwealth* v. *New Bedford Bridge Co.*, 2 Gray, 339; *Commonwealth* v. *Pittsburg & Connellsville R. Co.*, 58 Pa. St. 26; *Mayor v. Connellsville & S. P. R. Co.*, 4 Am. Law Register (N. S.), 750; *Fisher* v. *McGirr*, 1 Gray, 36; *Colon* v. *Lisk*, 153 N. Y. 188.

Section 18, of the act of March 3, 1899, under which these proceedings were had, does not provide for "due process of law." That term means a course of legal proceedings according to those rules and proceedings which have been established by our jurisprudence for the protection and enforcement of public rights. *Kennard* v. *Louisiana*, 92 U. S. 480; *Pennoyer v. Neff*, 95 U. S. 714; *Hager* v. *Reclamation District*, 111 U. S. 701; *Ex parte Wall*, 107 U. S. 265; *United States* v. *Lee*, 106 U. S. 196; *Kelly* v. *City of Pittsburg*, 104 U. S. 78; *Hovey* v. *Elliott*, 167 U. S. 409.

*Mr. Milton D. Purdy,* Assistant to the Attorney General, for defendant in error:

Administrative process which has been regarded as necessary by the Government and sanctioned by long usage, is as much due process of law as any other. *Wulzen* v. *San Francisco*, 101 California, 15; *Attorney General* v. *Jochin*, 99 Michigan, 358; *Eames* v. *Savage*, 77 Maine, 212; *Holmes* v. *Seeley*, 19 Wend. 507; *Ex parte Milligan*, 4 Wall. 2.

Due process of law does not necessarily require that a judicial hearing shall be accorded before any preliminary action can be taken by the administrative officers of the Government which may result in a temporary deprivation of certain rights of a citizen. If the law contemplates that the citizen whose

rights are affected by certain administrative acts and processes shall finally be accorded an opportunity to have those rights passed upon in a judicial proceeding, then and in such a case due process of law has not been denied within the meaning of the Constitution. *Murray's Lessee* v. *Hoboken Land Co.,* 18 How. 272.

While it is manifest that a law cannot withdraw from judicial determination a controversy with respect to private rights which from its nature is the subject of a suit at common law, or in equity, or in admiralty, it is likewise clear that in respect to matters involving public rights as distinguished from private rights the legislature may provide that so far as the determination of facts is concerned that the action of the administrative officers' may be made final and conclusive. *Kennedy* v. *Gibson,* 8 Wall. 498; *Casey* v. *Galli,* 94 U. S. 673; *United States* v. *Knox,* 102 U. S. 422; *Bushnell* v. *Leland,* 164 U. S. 684; *Buttfield* v. *Stranahan,* 192 U. S. 470; *Public Clearing House* v. *Coyne,* 194 U. S. 497.

This law does not operate to take private property for public use within the meaning of the Fifth Amendment to the Federal Constitution. *New Orleans Gas Light Co.* v. *Drainage Commissioners,* 197 U. S. 453; *C., B. & Q. Ry. Co.* v. *Drainage Comm'rs,* 200 U. S. 561; *West Chicago R. R.* v. *Chicago,* 201 U. S. 506.

Section 18, under which the plaintiff in error was convicted, does not delegate to the Secretary of War legislative or judicial powers. *Buttfield* v. *Stranahan,* 192 U. S. 470; *Field* v. *Clark,* 143 U. S. 649.

MR. JUSTICE HARLAN, after making the foregoing statement, delivered the opinion of the court.

The first principal question raised by the defendant is whether the 18th section of the River and Harbor Act of March 3d, 1899, is in violation of the Constitution of the United States as delegating legislative and judicial powers

to the head of an Executive Department of the Government. This question, the Government contends, has been determined in its favor by the principles heretofore announced by this court, and need not be discussed as if now presented for the first time. In its judicial as well as legal aspects the question is of such importance as to justify a full reference to prior decisions.

The earliest case is that of *The Brig Aurora*, 7 Cranch, 382, which involved the question whether Congress could make the revival of a law (which had ceased to be in force) depend upon the existence of certain facts to be ascertained by the President and set forth in a proclamation by him. The court said: "We can see no sufficient reason why the legislature should not exercise its discretion in reviving the act of March 1st, 1809, either expressly or conditionally, as their judgment should direct. The 19th section of that act, declaring that it should continue in force to a certain time, and no longer, could not restrict their power of extending its operation without limitation upon the occurrence of any subsequent combination of events." Referring to this language, we said in the subsequent case of *Field* v. *Clark*, 143 U. S. 649, 683: "This certainly is a decision that it was competent for Congress to make the revival of an act depend upon the proclamation of the President, showing the ascertainment by him of the fact that the edicts of certain nations had been so revoked or modified that they did not violate the neutral commerce of the United States. The same principle would apply in the case of the suspension of an act upon a contingency to be ascertained by the President and made known by his Proclamation."

In *Wayman* v. *Southard*, 10 Wheat. 1, 43, 45, 46, Chief Justice Marshall delivering the unanimous judgment of the court, said that although Congress could not delegate to the courts or to any other tribunals powers strictly and exclusively legislative, and although the line had not been exactly drawn that separates the important subjects which must be entirely

regulated by the legislature itself from those of less interest "in which a general provision may be made, and powers given to those who are to act under such general provisions to fill up the details," yet "Congress may certainly delegate to others powers which the legislature may rightly exercise itself," and " the maker of the law may commit something to the discretion of the other departments."

In *Field* v. *Clark*, just cited, 143 U. S. 649, 680, 683, 691, 692, the question arose as to the constitutionality of that section of the McKinley Tariff Act of 1890 which provided for the imposition, in a named contingency (to be determined by the President and manifested by his proclamation), of duties upon sugar, molasses and other specified articles, which the act had placed in the free list. By that section it was declared that "with a view to secure reciprocal trade with countries producing the following articles, and for this purpose, on and after the first day of January, eighteen hundred and ninety-two, whenever, and so often as the President shall be satisfied that the government of any country producing and exporting sugars, molasses, coffee, tea and hides, raw and uncured, or any of such articles, imposes duties or other exactions upon the agricultural or other products of the United States, which in view of the free introduction of such sugar, molasses, coffee, tea and hides into the United States he may deem to be reciprocally unequal and unreasonable, he shall have the power and it shall be his duty to suspend, by proclamation to that effect, the provisions of this act relating to the free introduction of such sugar, molasses, coffee, tea and hides, the production of such country, for such time as he shall deem just, and in such case and during such suspension duties shall be levied, collected and paid upon sugar, molasses, coffee, tea and hides, the product of or exportation from such designated country as follows, namely." Here follows in the act provisions indicating the particular duties to be collected, after the President's proclamation, upon sugars, molasses, coffee, tea, hides, etc. It was contended in the *Field case* that the

above section, so far as it authorized the President, to suspend
by proclamation the provisions of the act relating to the free
introduction of sugar, molasses, coffee, etc., was unconstitu-
tional, as delegating to him both legislative and treaty-making
powers. In its consideration of this question the court, after
referring to the case of the *Brig Aurora*, above cited, exam-
ined the numerous precedents in legislation showing to what
extent the suspension of certain provisions and the going into
operation of other provisions of an act of Congress had been
made to depend entirely upon the finding or ascertainment by
the President of certain facts, to be made known by his procla-
mation. The acts of Congress which underwent examination
by the court are noted in the margin.[1] The result of that
examination of legislative precedents was thus stated: "The
authority given to the President by the act of June 4, 1794, to
lay an embargo on all ships and vessels in the ports of the
United States, 'whenever, in his opinion, the public safety
shall so require,' and under regulations, to be continued or
revoked, 'whenever he shall think proper;' by the act of Feb-
ruary 9, 1799, to remit and discontinue, for the time being,
the restraints and prohibitions which Congress had prescribed
with respect to commercial intercourse with the French Re-
public, 'if he shall deem it expedient and consistent with the
interest of the United States,' and 'to revoke such order,
whenever, in his opinion, the interest of the United States shall
require;' by the act of December 19, 1806, to suspend, for a
named time, the operation of the non-importation act of the
same year, 'if in his judgment the public interest should re-
quire it;' by the act of May 1, 1810, to revive a former act,
as to Great Britain or France, if either country had not by a

---

[1] Act of June 13th, 1798, c. 53, 1 Stat. 565, 566; of February 9th, 1799, c. 2,
1 Stat. 613, of April 18th, 1806, c. 29, 2 Stat. 379; of December 19th,
1806, c. 1, 2 Stat. 411; of March 3d, 1815, c. 77, 3 Stat. 224; of March 3d,
1817, c. 39, 3 Stat. 361; of January 7th, 1824, c. 4, 4 Stat. 3; of May 24th,
1828, c. 111, 4 Stat. 308; of May 31st, 1830, c. 219, 4 Stat. 425; of
August 5, 1854, c. 269, 10 Stat. 587; 11 Stat. 790; of March 6th, 1866, c. 12,
14 Stat. 3; 26 Stat. 616, c. 1244; of Act June 26th, 1884, c. 121, 23 Stat. 57.

named day so revoked or modified its edicts as not 'to violate the neutral commerce of the United States;' by the acts of March 3, 1815, and May 31, 1830, to declare the repeal, as to any foreign nation, of the several acts imposing duties on the tonnage of ships and vessels, and on goods, wares and merchandise imported into the United States, when he should be 'satisfied' that the discriminating duties of such foreign nations, 'so far as they operate to the disadvantage of the United States,' had been abolished; by the act of March 6, 1866, to declare the provisions of the act forbidding the importation into this country of neat cattle and the hides of neat cattle, to be inoperative, 'whenever in his judgment' their importation 'may be made without danger of the introduction or spread of contagious or infectious disease among the cattle of the United States;' must be regarded as unwarranted by the Constitution, if the contention of the appellants, in respect to the third section of the act of October 1, 1890, be sustained."

Touching the general question the court said: "That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution. The act of October 1, 1890, in the particular under consideration, is not inconsistent with that principle. It does not, in any real sense, invest the President with the power of legislation. For the purpose of securing reciprocal trade with countries producing and exporting sugar, molasses, coffee, tea and hides, Congress itself determined that the provisions of the act of October 1, 1890, permitting the free introduction of such articles, should be suspended as to any country producing and exporting them that imposed exactions and duties on the agricultural and other products of the United States, which the President deemed, that is, which he found to be, reciprocally unequal and unreasonable. Congress itself prescribed, in advance, the duties to be levied, collected and paid, on sugar, molasses, coffee, tea or hides, produced by or exported from such designated country, while the suspension

lasted. Nothing involving the expediency or the just opera-
tion of such legislation was left to the determination of the
President. The words, 'he may deem,' in the third section,
of course, implied that the President would examine the com-
mercial regulations of other countries producing and exporting
sugar, molasses, coffee, tea and hides, and form a judgment
as to whether they were reciprocally equal and reasonable, or
the contrary, in their effect upon American products. But
when he ascertained the fact that duties and exactions, re-
ciprocally unequal and unreasonable, were imposed upon the
agricultural or other products of the United States by a country
producing and exporting sugar, molasses, coffee, tea or hides,
it became his duty to issue a proclamation declaring the sus-
pension, as to that country, which Congress had determined
should occur. He had no discretion in the premises except
in respect to the duration of the suspension so ordered. But
that related only to the enforcement of the policy established
by Congress. As the suspension was absolutely required when
the President ascertained the existence of a particular fact, it
cannot be said that in ascertaining that fact and in issuing his
proclamation, in obedience to the legislative will, he exercised
the function of making laws. Legislative power was exercised
when Congress declared that the suspension should take effect
upon a named contingency. What the President was required
to do was simply in execution of the act of Congress. It was
not the making of law. He was the mere agent of the law-
making department to ascertain and declare the event upon
which its expressed will was to take effect. It was a part of
the law itself as it left the hands of Congress that the pro-
visions, full and complete in themselves, permitting the free
introduction of sugars, molasses, coffee, tea and hides, from
particular countries, should be suspended, in a given con-
tingency, and that in case of such suspensions certain duties
should be imposed." Again: " 'The true distinction,' as
Judge Ranney speaking for the Supreme Court of Ohio has
well said, 'is between the delegation of power to make the law,

which necessarily involves a discretion as to what it shall be and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.' *Cincinnati, Wilmington &c. Railroad* v. *Commissioners*, 1 Ohio St. 77. In *Moers* v. *City of Reading*, 21 Pa. St. 188, 202, the language of the court was : 'Half the statutes on our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said that the exercise of such discretion is the making of the law.' So, in *Locke's Appeal*, 72 Pa. St. 491, 498: 'To assert that a law is less than a law, because it is made to depend on a future event or act, is to rob the legislature of the power to act wisely for the public welfare whenever a law is passed relating to a state of affairs not yet developed, or to things future and impossible to fully know.' The proper distinction the court said was this: 'The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation.' What has been said is equally applicable to the objection that the third section of the act invests the President with treaty-making power. The court is of the opinion that the third section of the act of October 1, 1890, is not liable to the objection that it transfers legislative and treaty-making power to the President.".

The latest case bearing on the general question is *Buttfield* v. *Stranahan*, 192 U. S. 470, 486. That case involved the constitutionality of the act of Congress of March 2, 1897, 29 Stat. 604, c. 358, relating to the "importations of impure and unwholesome tea." The act provided for the appointment by

the Secretary of the Treasury of a board of seven tea experts, who should prepare and submit to him standard samples of that article.  One section of the act provided: "That the Secretary of the Treasury, upon the recommendation of the said board, shall fix and establish uniform standards of purity; quality, and fitness for consumption of all kinds of teas im-, ported into the United States, and shall procure and deposit in the custom-houses of the ports of New York, Chicago, San Francisco, and such other ports as he may determine, duplicate samples of such standards; that said Secretary shall procure a sufficient number of other duplicate samples of such stand-. ards to supply the importers and dealers in tea at all ports desiring the same at cost. All teas, or merchandise described as tea, of inferior purity, quality, and fitness for consumption to such standards shall be deemed within the prohibition of the first section hereof."  In that case it was contended that the act was unconstitutional, as making the right to import tea depend upon the arbitrary action of the Secretary of the Treasury and a board appointed by him; as excluding from import wholesome, genuine and unadulterated tea; and, as discriminating unequally. in the admission of the different kinds of teas for import, as well as in the right to sell and purchase that article.  The act conferred, it was objected, upon the Secretary and the board the uncontrolled power of fixing standards of purity, quality and fitness for consumption, and thus to prescribe arbitrarily what teas may be imported and dealt in.  The question of constitutional law so raised was thus disposed of by the court: "The claim that the statute commits to the arbitrary discretion of the Secretary of the Treasury the determination of what teas may be imported, and therefore in effect vests that official with legislative power, is without merit.  We are of opinion that the statute, when properly construed, as said by the Circuit Court of Appeals, but expresses the purpose to exclude the lowest grades of tea, whether demonstrably of inferior purity, or unfit for con-. sumption, or presumably so because of their inferior quality.

This, in effect, was the fixing of a primary standard, and devolved upon the Secretary of the Treasury the mere executive duty to effectuate the legislative policy declared in the statute. The case is within the principle of *Field* v. *Clark,* 143 U. S. 649, where it was decided that the third section of the tariff act of October 1, 1890, was not repugnant to the Constitution as conferring legislative and treaty-making power on the President, because it authorized him to suspend the provisions of the act relating to the free introduction of sugar, molasses, coffee, tea and hides. We may say of the legislation in this case, as was said of the legislation considered in *Field* v. *Clark,* that it does not, in any real sense, invest administrative officials with the power of legislation. Congress legislated on the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute. To deny the power of Congress to delegate such a duty would, in effect, amount but to declaring that the plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted."

It would seem too clear to admit of serious doubt that the statute under which the Secretary of War proceeded is in entire harmony with the principles announced in former cases. In no substantial, just sense does it confer upon that officer as the head of an Executive Department powers strictly legislative or judicial in their nature, or which must be exclusively exercised by Congress or by the courts. It has long been the policy of the Government to remove such unreasonable obstructions to the free navigation of the waterways of the United States as were caused by bridges maintained over them. That such an object was of common interest and within the competency of Congress, under its power to regulate commerce, everyone must admit; for commerce comprehends navigation, and therefore to free navigation from unreasonable obstructions is a legitimate exertion of that power. *Gibbons* v. *Ogden,* 9 Wheat. 1, 189, 190. As appropriate to the object

to be accomplished, as a means to an end within the power of the National Government, Congress, in execution of a declared policy, committed to the Secretary of War the duty of ascertaining all the facts essential in any inquiry whether particular bridges, over the waterways of the United States, were unreasonable obstructions to free navigation. Beyond question, if it had so elected, Congress, in some effective mode and without previous investigation through Executive officers, could have determined for itself, primarily, the fact whether the bridge here in question was an unreasonable obstruction to navigation, and, if it was found to be of that character, could by direct legislation have required the defendant to make such alterations of its bridge as were requisite for the protection of navigation and commerce over the waterway in question. But investigations by Congress as to each particular bridge alleged to constitute an unreasonable obstruction to free navigation and direct legislation covering each case, separately, would be impracticable in view of the vast and varied interests which require National legislation from time to time. By the statute in question Congress declared in effect that navigation should be freed from unreasonable obstructions arising from bridges of insufficient height, width of span or other defects. It stopped, however, with this declaration of a general rule and imposed upon the Secretary of War the duty of ascertaining what particular cases came within the rule prescribed by Congress, as well as the duty of enforcing the rule in such cases. In performing that duty the Secretary of War will only execute the clearly expressed will of Congress, and will not, in any true sense, exert legislative or judicial power. He could not be said to exercise strictly legislative or judicial power any more, for instance, than it could be said that Executive officers exercise such power when, upon investigation, they ascertain whether a particular applicant for a pension belongs to a class of persons who, under the general rules prescribed by Congress, are entitled to pensions. If the principle for which the defendant

contends received our approval the conclusion could not be avoided that Executive officers, in all the Departments, in carrying out the will of Congress, as expressed in statutes enacted by it, have, from the foundation of the National Government, exercised and are now exercising powers, as to mere details, that are strictly legislative or judicial in their nature. This will be apparent upon an examination of the various statutes that confer authority upon Executive Departments in respect of the enforcement of the laws of the United States. Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends would be "to stop the wheels of government" and bring about confusion, if not paralysis, in the conduct of the public business.

To this may be added the consideration that Congress, by the act of 1899, did not invest the Secretary of War with any power in these matters that could reasonably be characterized as arbitrary. He cannot act in reference to any bridge alleged to be an unreasonable obstruction to free navigation without first giving the parties an opportunity to be heard. He cannot require any bridge of that character to be altered, even for the purpose of rendering navigation through or under it reasonably free, easy and unobstructed, without giving previous notice to the persons or corporations owning or controlling the bridge, specifying the changes recommended by the Chief of Engineers, and allowing a reasonable time in which to make them. If, at the end of such time, the required alterations have not been made, then the Secretary is required to bring the matter to the attention of the United States District Attorney in order that criminal proceedings may be instituted to enforce the act of Congress. In the present case all the provisions of the statute were complied with. The parties concerned were duly notified and were fully heard. Nor is there any reason to say that the Secretary of War was not entirely justified, if not compelled, by the evidence in finding

that the bridge in question was an unreasonable obstruction to commerce and navigation as now conducted.

We are of opinion that the act in question is not unconstitutional as conferring upon the Secretary of War powers of such nature that they could not be delegated to him by Congress.

The next principal contention of the Bridge Company is that the act of 1899 is unconstitutional, in that it makes no provision, and the United States has not offered, to compensate it for the sum that will necessarily be expended in order to make the alterations or changes required by the order of the Secretary of War. In other words, the defendant insists, that what the United States requires to be done in respect of defendant's bridge is a taking of private property for public use, which the Government is forbidden by the Constitution to do without making just compensation to, or without making provision to justly compensate, the owner. Stating the question in another way, the contention is, in effect, that even if the United States did not expressly assent to the construction of this bridge as it is, and even if the bridge has become an unreasonable obstruction to the free navigation of the waterway in question, the exertion of the power of the United States to regulate commerce among the States is subject to the fundamental condition that it cannot require the defendant, whose bridge was lawfully constructed, to make any alterations however necessary to secure free navigation, without paying or securing to it compensation for the reasonable cost of such alterations.

The propositions are combatted by the Government, which contends that the alterations or changes required to secure navigation against an unreasonable obstruction is not a *taking* of private property for public use within the meaning of the Constitution, and that the cost of such alterations or changes are to be deemed incidental only to the exercise of an undoubted function of the United States, when exerting, through Congress, its power to regulate commerce among the States,

and therefore navigation upon the waterways on and over which such commerce is conducted.

It would seem clear that this issue has likewise been determined by the principles announced in the previous cases of this court. Let us see whether such be the fact.

A leading case upon this subject is *Gibson* v. *United States*, 166 U. S. 269, 271 *et seq.* Congress, by the River and Harbor Acts of 1884 and 1886, 23 Stat. 133, 147, 24 Stat. 316, 327, authorized and directed the improvement of the Ohio River, and made appropriations to effect that object. Under the authority of the Secretary of War, and the Engineer Corps of the Army, a dike was constructed in that river for the purpose of concentrating the water-flow in the main channel of the river, near Neville Island. The dike began at a certain point on the island. Its construction substantially destroyed the landing on and in front of a farm, owned by Mrs. Gibson, on that island—preventing, during most of the year, free egress and ingress from and to such farm to the main or navigable channel of the river. At the time of the construction of the dike that farm was in a high state of cultivation, well improved with a dwelling house, barn and outbuildings. It had a frontage of a thousand feet on the main navigable channel, and the owner had a landing there which was used in the shipping of products from and supplies to her farm, and was the only one from which such products and supplies could be shipped. Before the construction of the dike the farm, by reason of the use to which it was put, was worth six hundred dollars per acre. The obstruction caused by the dike reduced its value to one hundred and fifty or two hundred dollars per acre, resulting in damages to the owner in excess of three thousand dollars. Suit was brought against the United States in the Court of Claims to recover such damages. That court found as a conclusion of law that the owner was not entitled to recover.

The Chief Justice of this court, delivering its unanimous judgment, said: "All navigable waters are under the con-

trol of the United States for the purpose of regulating and improving navigation, and although the title to the shore and submerged soil is in the various States and individual owners under them, it is always subject to the servitude in respect of navigation created in favor of the Federal government by the Constitution. *South Carolina* v. *Georgia*, 93 U. S. 4; *Shively* v. *Bowlby*, 152 U. S. 1; *Eldridge* v. *Trezevant*, 160 U. S. 452." After referring to several adjudged cases the court proceeded: "The Fifth Amendment to the Constitution of the United States provides that private property shall not 'be taken for public use without just compensation.' Here, however, the damage of which Mrs. Gibson complained was not the result of the taking of any part of her property, whether upland or submerged, or a direct invasion thereof, but the incidental consequence of the lawful and proper exercise of a governmental power. The applicable principle is expounded in *Transportation Co.* v. *Chicago*, 99 U. S. 635. In that case, plaintiff being an owner of land situated at the intersection of La Salle street, in Chicago, with the Chicago River, upon which it had valuable dock and warehouse accommodations, with a numerous line of steamers accustomed to land at that dock, was interrupted in his use thereof by the building of a tunnel under the Chicago River by authority of the state legislature, in accomplishing which work it was necessary to tear up La Salle Street, which precluded plaintiff from access to his property for a considerable time; also to build a coffer dam in the Chicago River, which excluded his vessels from access to his docks; and such an injury was held to be *damnum absque injuria*. The court said, again speaking through Mr. Justice Strong: 'But acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the State or its agents, or give him any

right of action. ·This is supported by an immense weight of authority. . . . Moreover, riparian ownership is subject to the obligation -to suffer the consequences of the improvement of navigation in the exercise of .the dominant right of the Government in that regard.  The legislative authority for these works consisted simply in an appropriation for their construction, but this was an assertion of a right belonging to the Government, to which riparian property was subject, and not- of a right to appropriate private property, not burdened with such servitude, .to public purposes.  In short, the damage resulting from the prosecution of this improvement of a navigable highway, for the public good, was not the result of a taking of appellant's property, and was merely incidental to the exercise of a servitude to which her property had always been subject."

· The *Gibson* case was referred to with approval in *Scranton* v. *Wheeler*, 179 U. S. 141, 153, 162.  The latter case involved the question whether the owner of land on the St. Mary's River in Michigan was entitled, under the Constitution of the United States, to be compensated for the injury or damage done him, as a riparian owner, by certain work done in that river under the authority of the United States.  The controlling question was whether the prohibition in the Constitution of the United States of the taking of private property for public use without just compensation has any application to the case of an owner of land bordering on a public navigable river whose access from his land to navigability is permanently lost by reason of the construction of a. pier resting on submerged lands in front of his upland, and which pier was erected by the United States for the purpose only of improving the navigation of such river.  After observing that when that which is done amounts, within the meaning of the Constitution, to a taking of private property for public use, and that Congress may not, in the exercise of its power to regulate commerce, override the provision for just compensation when private property is so taken, the court entered

upon a review of some of the adjudged cases. Among other things it said: "All the cases concur in holding that the power of Congress to regulate commerce, and therefore navigation, is paramount, and is unrestricted except by the limitations upon its authority by the Constitution. Of course, every part of the Constitution is as binding upon Congress as upon the people. The guarantees prescribed by it for the security of private property must be respected by all. But whether navigation upon waters over which Congress may exert its authority requires improvement at all, or improvement in a particular way, are matters wholly within its discretion; and the judiciary is without power to control or defeat the will of Congress, so long as that branch of the Government does not transcend the limits established by the supreme law of the land. Is the broad power with which Congress is invested burdened with the condition that a riparian owner whose land borders upon a navigable water of the United States shall be compensated for his right of access to navigability whenever such right ceases to be of value in consequence of the improvement of navigation by means of piers resting upon submerged lands away from the shore line? We think not." "The primary use," the court said, "of the waters and the lands under them is for purposes of navigation, and the erection of piers in them to improve navigation for the public is entirely consistent with such use, and infringes no right of the riparian owner. Whatever the nature of the interest of a riparian owner in the submerged lands in front of his upland bordering on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water. It is a qualified title, a bare technical title, not at his absolute disposal, as is his upland, but to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation. In *Lorman* v. *Benson,* 8 Michigan, 18, 22, the Supreme Court of Michigan, speaking

by Justice Campbell, declared the right of navigation to be one to which all others were subservient. . . . But the contention is that compensation must be made for the loss of the plaintiff's access from his upland to navigability incidentally resulting from the occupancy of the submerged lands, even if the construction and maintenance of a pier resting upon them be necessary or valuable in the proper improvement of navigation. We cannot assent to this view. If the riparian owner cannot enjoy access to navigability because of the improvement of navigation by the construction away from the shore line of works in a public navigable river or water, and if such right of access ceases alone for that reason to be of value, there is not, within the meaning of the Constitution, a taking of private property for public use, but only a consequential injury to a right which must be enjoyed, as was said in the *Yates case,* 'in due subjection to the rights of the public'—an injury resulting incidentally from the exercise of a governmental power for the benefit of the general public, and from which no duty arises to make or secure compensation to the riparian owner. The riparian owner acquired the right of access to navigability subject to the contingency that such right might become valueless in consequence of the erection under competent authority of structures on the submerged lands in front of his property for the purpose of improving navigation. When erecting the pier in question, the Government had no object in view except, in the interest of the public, to improve navigation. It was not designed arbitrarily or capriciously to destroy rights belonging to any riparian owner. What was done was manifestly necessary to meet the demands of international and interstate commerce." The court further said: "In our opinion, it was not intended that the paramount authority of Congress to improve the navigation of the public navigable waters of the United States should be crippled by compelling the Government to make compensation for the injury to a riparian owner's right of access to navigability that might incidentally result from

an improvement ordered by Congress; The subject with which Congress dealt was navigation. That which was sought to be accomplished was simply to improve navigation on the waters in question so as to meet the wants of the vast commerce ' passing and to pass over them. Consequently the agents designated to perform the work ordered or authorized by Congress had the right to proceed in all proper ways without taking into account the injury that might possibly or indirectly result from such work to the right of access by riparian owners to navigability. . . . We are of opinion that the court below correctly held that the plaintiff had no such right of property in the submerged lands on which the pier in question rests as entitles him, under the Constitution, to be compensated for any loss of access from his upland to navigability resulting from the erection and maintenance of such pier by the United States in order to improve and which manifestly did improve the navigation of a public navigable water."

In *New Orleans Gas Light Co.* v. *Drainage Comm.*, 197 U. S. 453, 461, 462, it appeared that, under contract with the City of New Orleans, and at its own expense, the Gas Light Company had lawfully laid its pipes at certain places in the public ways and streets of that city. Subsequently, the Drainage Commission of New Orleans adopted a plan for the drainage of the city, which made it necessary to change the location in some places of the mains and pipes theretofore laid by the Gas Light Company. That company contended that to require such changes was a taking of its property for public use for which it was entitled, under the Constitution, to compensation. That view was rejected by this court. We said: "The gas company did not acquire any specific location in the streets; it was content with the general right to use them, and when it located its pipes it was at the risk that they might be, at some future time, disturbed, when the State might require for a necessary public use that changes in location be made. . . . The need of occupation of the

soil beneath the streets in cities is constantly increasing, for the supply of water and light and the construction of systems of sewerage and drainage, and every reason of public policy requires that grants of rights in such sub-surface shall be held subject to such reasonable regulation as the public health and safety may require. There is nothing in the grant to the gas company, even if it could legally be done, undertaking to limit the right of the State to establish a system of drainage in the streets. We think whatever right the gas company acquired was subject in so far as the location of its pipes was concerned, to such future regulations as might be required in the interest of the public health and welfare. These views are amply sustained by the authorities. *National Water Works Co.* v. *City of Kansas*, 28 Fed. Rep. 921, in which the opinion was delivered by Mr. Justice Brewer, then Circuit Judge; *Gas Light & Coke Co.* v. *Columbus*, 50 Ohio St. 65; *Jamaica Pond Aqueduct Co.* v. *Brookline*, 121 Massachusetts, 5; *In re Deering*, 93 N. Y. 361; *Chicago, Burlington &c. R. R. Co.* v. *Chicago*, 166 U. S. 226, 254. In the latter case it was held that uncompensated obedience to a regulation enacted for the public safety under the police power of the State was not taking property without due compensation. In our view, that is all there is to this case. The gas company, by its grant from the city, acquired no exclusive right to the location of its pipes in the streets, as chosen by it, under a general grant of authority to use the streets. The city made no contract that the gas company should not be disturbed in the location chosen. In the exercise of the police power of the State, for a purpose highly necessary in the promotion of the public health, it has become necessary to change the location of the pipes of the gas company so as to accommodate them to the new public work. In complying with this requirement at its own expense none of the property of the gas company has been taken, and the injury sustained is *damnum absque injuria.*"

In *C., B. & Q. R. R. Co.* v. *Drainage Com'rs*, 200 U. S. 561,

582, 593–595, the above cases were cited with approval, and the principles announced in them were applied against a railway company owning a bridge that had been lawfully constructed by it over a non-navigable creek running through certain swamp or slough lands which the Drainage Commissioners were required by statute to drain in order to make them tillable and fit for cultivation. The Commissioners in executing the work of draining found it necessary that the creek over which the railway bridge was constructed should be deepened and enlarged, and a greater opening made under the bridge for the passage of the increased amount of water caused by the deepening and enlarging of the bed of the creek. The railway company was required, at its own cost, to construct such a bridge over the creek as would meet the necessities of the situation as it was or would be under the drainage plan of the Commissioners. The company refused to obey the order. The contention of the railway company was that as the bridge was lawfully constructed under its general corporate powers, and as the depth and width of the channel under it were sufficient, at the time, to carry off the water of the creek as it then and subsequently flowed, the foundation of the bridge could not be removed and its use of the bridge disturbed, unless compensation be first made or secured to the company in such amount as would be sufficient to meet the expense of removing the timbers and stones from the creek and of constructing a new bridge of such length and with such opening under it as the plan of the Commissioners would make necessary. The company insisted that to require it to meet these expenses out of its own funds would be within the meaning of the Constitution a *taking* of its property for public use without compensation, and, therefore, without due process of law. The court, after a review of authorities, said: "The constitutional requirement of due process of law, which embraces compensation for private property taken for public use, applies in every case of the exertion of governmental power. If in the execution of any power, no matter what it is, the Government,

Federal or state, finds it necessary to take private property for public use, it must obey the constitutional injunction to make or secure just compensation to the owner. *Cherokee Nation* v. *Southern Kansas Railway*, 135 U. S. 641, 659; *Sweet* v. *Rechel*, 159 U. S. 380, 399, 402; *Monongahela Nav. Co.* v. *United States,* 148 U. S. 312, 336; *United States* v. *Lynah*, 188 U. S. 445. If the means employed have no real substantial relation to public objects which government may legally accomplish; if they are arbitrary and unreasonable, beyond the necessities of the case, the judiciary will disregard mere forms and interfere for the protection of rights injuriously affected by such illegal action. The authority of the courts to interfere in such cases is beyond all doubt. *Minnesota* v. *Barber*, 136 U. S. 313, 320. Upon the general subject there is no real conflict among the adjudged cases. Whatever conflict there is arises upon the question whether there has been or will be in the particular case, within the true meaning of the Constitution, a 'taking' of private property for public use. If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is no *taking* of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution. Such is the present case." The opinion concluded: "Without further discussion we hold it to be the duty of the railway company, at its own expense, to remove from the creek the present bridge, culvert, timbers and stones placed there by it, and also. (unless it abandons or surrenders its right to cross the creek at or in the vicinity of the present crossing) to erect at its own expense and maintain a new bridge for crossing that will conform to the regulations established by the Drainage Commissioners, under the authority of the State; and such a requirement if enforced will not amount to a taking of private property for public use within the meaning of the Constitution, nor to a denial of the equal protection of the laws."

The latest adjudication by this court was in *West Chicago*

*Street Railroad* v. *Chicago,* 201 U. S. 506, 524. In that case
the principal question related to the duty of a street railroad
company, which had lawfully constructed a tunnel under the
Chicago River, to obey an ordinance of the city, requiring the
company, at its own cost and expense, to lower its tunnel, so as
to provide for a certain depth under it, which had been ascer-
tained by competent Federal and local authority to be neces-
sary for the increased demands of navigation. This court held
upon the adjudged cases that the rights of the company, as the
owner of the fee of the land, on either side of the river or in its
bed, were subject to the paramount right of navigation over the
waters of the river. It said: "If, then, the right of the railroad
company to have and maintain a tunnel under the Chicago
river is subject to the paramount public right of navigation;
if its right to maintain a tunnel in the river is a qualified one,
because subject to the specific condition in the act of 1874
that no tunnel should interrupt navigation; if the present
tunnel is an obstruction to navigation, as upon this record we
must take it to be; and if the city, as representing the State
and public, may rightfully insist that such obstruction shall
not longer remain in the way of free navigation; it necessarily
follows that the railway company is under a duty to comply
with the demand made upon it to remove, at its own expense,
the obstruction which itself has created and maintains. If
the obstruction cannot be removed except by lowering the
tunnel to the required depth and (if a tunnel is to be main-
tained) providing one that will not interrupt navigation, then
the cost attendant upon such work must be met by the com-
pany. The city asks nothing more than that the railroad
company shall do what is necessary to free navigation from an
obstruction for which it is responsible, and (if it intends not
to abandon its right to maintain a tunnel at or near Van Buren
street) that it shall itself provide a new tunnel with the neces-
sary depth of water above it." Again: "In the case before us
the public demands nothing to be done by the railroad com-
pany except to remove the obstruction which itself placed and

maintains in the river under the condition that navigation should not at any time be thereby interrupted. The removal of such obstruction is all that is needed to protect navigation. So that whatever cost attends the removal of the obstruction must be borne by the railroad company. The condition under which the company placed its tunnel in the river being met by the company, the public has no further demands upon it. This cannot be deemed a taking of private property for public use or a denial of the equal protection of laws within the meaning of the Constitution, but is only the result of the lawful exercise of a governmental power for the common good. This appears from the authorities cited in *Chicago, Burlington & Quincy R. R. Co.* v. *Drainage Com'rs, supra,* just cited. The state court has well said that to maintain the navigable character of the stream in a lawful way is not, within the meaning of the law, the taking of private property or any property right of the owner of the soil under the river, such ownership being subject to the right of free and unobstructed navigation. *People* v. *West Chicago Street R. R. Co.,* 203 Illinois, 551, 557. What the city asks, and all that it asks, is that the railroad company be required, in the exercise of its rights and in the use of its property, to respect the public needs as declared by competent authority, upon reasonable grounds, to exist. This is not an arbitrary or unreasonable demand. It does not, in any legal sense, take or appropriate the company's property for the public benefit, but only insists that the company shall not use its property so as to interrupt navigation."

Do the principles announced in the above cases require us to hold, in the present case, that the making of the alterations of its bridge specified in the order of the Secretary of War will be a taking of the property of the Bridge Company for public use? We think not. Unless there be a taking, within the meaning of the Constitution, no obligation arises upon the United States to make compensation for the cost to be incurred in making such alterations. The damage that will accrue to the Bridge Company, as the result of compliance

with the Secretary's order, must, in such case, be deemed incidental to the exercise by the Government of its power to regulate commerce among the States, which includes, as we have seen, the power to secure free navigation upon the waterways of the United States against unreasonable obstructions. There are no circumstances connected with the original construction of the bridge, or with its maintenance since, which so tie the hands of the Government that it cannot exert its full power to protect the freedom of navigation against obstructions. Although the bridge, when erected under the authority of a Pennsylvania charter, may have been a lawful structure, and although it may not have been an unreasonable obstruction to commerce and navigation *as then carried on*, it must be taken, under the cases cited, and upon principle, not only that the company when exerting the power conferred upon it by the State, did so with knowledge of the paramount authority of Congress to regulate commerce among the States, but that it erected the bridge subject to the possibility that Congress might, at some future time, when the public interest demanded, exert its power by appropriate legislation to protect navigation against unreasonable obstructions. Even if the bridge, in its original form, was an unreasonable obstruction to navigation, the mere failure of the United States, at the time, to intervene by its officers or by legislation and prevent its erection, could not create an obligation on the part of the Government to make compensation to the company if, at a subsequent time, and for public reasons, Congress should forbid the maintenance of bridges that had become unreasonable obstructions to navigation. It is for Congress to determine when it will exert its power to regulate interstate commerce. Its mere silence or inaction when individuals or corporations, under the authority of a State, place unreasonable obstructions in the waterways of the United States, cannot have the effect to cast upon the Government an obligation not to exert its constitutional power to regulate interstate commerce except subject to the condition that compensation be

made or secured to the individuals or corporation who may be incidentally affected by the exercise of such power. The principle for which the Bridge Company contends would seriously impair the exercise of the beneficent power of the Government to secure the free and unobstructed navigation of the waterways of the United States. We cannot give our assent to that principle. In conformity with the adjudged cases, and in order that the constitutional power of Congress may have full operation, we must adjudge that Congress has power to protect navigation on all waterways of the United States against unreasonable obstructions, even those created under the sanction of a State, and that an order to so alter a bridge over a waterway of the United States that it will cease to be an unreasonable obstruction to navigation will not amount to a taking of private property for public use for which compensation need be made.

Independent of the grounds upon which we thus place our decision, it is appropriate to observe that the conclusion reached finds support in the charter of the Bridge Company and in the law of Pennsylvania as declared by its highest court. The charter of the company, as we have seen, expressly warned the company that its bridge must not obstruct navigation—that is, in legal effect, navigation as it then was, or might be, at any subsequent time. In *Dugan* v. *Bridge Company*, 27 Pa. St. 303, 309, 311, we have the case of a bridge company on which was conferred the franchise to erect and maintain a toll-bridge across Monongahela River, coupled, however, with the condition that such bridge should not be erected "in such manner as to injure, stop, or interrupt the navigation of such river by boats, rafts or other vessels." The Supreme Court of Pennsylvania interpreted these words as meaning that "the bridge was to be so built as not to injure, stop or interrupt the navigation, either then or now, whether in its infancy or full growth." The same general question arose in *C., B. & Q. Railway Co.* v. *Drainage Comm'rs*, above cited. This court held that the adjudged cases "negative the

suggestion of the railway company that the adequacy of its bridge and the opening under it for passing the water of the creek at the time the bridge was constructed determine its obligations to the public at all subsequent periods. In *Cooke* v. *Boston & Lowell R. R.*, 133 Massachusetts, 185, 188, it appeared that a railroad company had statutory authority to cross a certain highway with its road. The statute provided that if the railroad crossed any highway it should be so constructed as not to impede or obstruct the safe and convenient use of the highway. And one of the contentions of the company was that the statute limited its duty and obligation to provide for the wants of travelers at the time it exercised the privilege granted to it. The court said: 'The legislature intended to provide against any obstruction of the safe and convenient use of the highway for all time; and if, by the increase of population in the neighborhood, or by an increasing use of the highway, the crossing which at the outset was adequate is no longer so, it is the duty of the railroad corporation to make such alteration as will meet the present needs of the public who have occasion to use the highway.' In *Lake Erie & Western R. R. Co.* v. *Cluggish*, 143 Indiana, 347, the court said (quoting from *Lake Erie & Western R. R. Co.* v. *Smith*, 61 Fed. Rep. 885), 'The duty of a railroad to restore a stream or highway which is crossed by the line of its road is a continuing duty; and if, by the increase of population or other causes the crossing becomes inadequate to meet the new and altered conditions of the country, it is the duty of the railroad to make such alterations as will meet the present needs of the public.' So, in *State of Indiana* v. *Lake Erie & Western R. R. Co.*, 83 Fed. Rep. 284, 287, which was the case of an overhead crossing lawfully constructed on one of the streets of a city, the court said: 'If, by the growth of population or otherwise, the crossing has become inadequate to meet the present needs of the public, it is the duty of the railroad company to remedy the defect by restoring the crossing so that it will not unnecessarily impair the usefulness of the highway.' "

Some stress was laid in argument upon the fact that com-' pliance with the order of the Secretary of War will compel the Bridge Company to make a very large expenditure in money. But that consideration cannot affect the decision of the questions of constitutional law involved. It is one to be addressed to the legislative branch of the Government. It is for Congress to determine whether, under the circumstances of a particular case, justice requires that compensation be made to a person or corporation incidentally suffering from the exercise by the National Government of its constitutional powers.

These are all the matters which require notice at our hands; and perceiving no error of law on the record, the judgment must be affirmed.

*It is so ordered.*

MR. JUSTICE BREWER and MR. JUSTICE PECKHAM dissent.

MR. JUSTICE MOODY did not participate in the consideration or decision of the case.