COOPERSVILLE CO-OPERATIVE CREAMERY CO. v. LEMON, Internal
Revenue Collector.

(Circuit Court of Appeals, Sixth Circuit.  May 25, 1908.)

No. 1,762.

1. CONSTITUTIONAL LAW—REGULATIONS OF COMMISSIONER UNDER OLEOMAR-
GARINE ACT—VALIDITY—"ADULTERATED BUTTER."
    Oleomargarine Act May 9, 1902, c. 784, § 4, 32 Stat. 194 (U. S. Comp.
St. Supp. 1907, p. 637), inter alia, imposes an internal revenue tax of 10
cents per pound on adulterated butter. It provides that "any butter in
the manufacture or manipulation of which any process or material is
used with intent or effect of causing the absorption of abnormal quantities
of water, milk or cream," shall be deemed "adulterated butter," and au-
thorizes the Commissioner of Internal Revenue to decide what substances
are taxable thereunder. It also authorizes him, with the approval of
the Secretary of the Treasury, to make all needful regulations for carry-
ing the act into effect. *Held*, that such a regulation, providing that butter
containing 16 per cent. or more of water, milk, or cream should be classi-
fied as "adulterated butter" under the act, was within the authority so
granted, and was valid, being neither an exercise of legislative or judicial
power, but merely a determination as a question of fact of what con-
stitutes an "abnormal" quantity of water, etc., upon which the application
of the statute is made to depend.
    [Ed. Note.—For other definitions, see Words and Phrases, vol. 1, p. 211.]

2. APPEAL AND ERROR—ACTION TO RECOVER TAXES PAID—SUBMISSION OF IS-
SUES—HARMLESS ERROR.
    Whether or not such regulation has the force of law as a conclusive de-
termination of the fact, it furnishes a working rule for the guidance of
officers and the information of manufacturers, and on the trial of an
action by a manufacturer to recover taxes exacted on butter claimed to
contain more than 16 per cent. of water the submission to the jury of
the question whether such a percentage of water was "abnormal" was
not an error of which the plaintiff could complain.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error,
§§ 4212–4218.]

3. INTERNAL REVENUE—CONSTRUCTION OF STATUTE—"ABSORPTION" DEFINED.
    In the provision of Oleomargarine Act May 9, 1902, c. 784, § 4, 32 Stat.
194 (U. S. Comp. St. Supp. 1907, p. 637), defining adulterated butter as
including "any butter in the manufacture or manipulation of which any
process or material is used with intent or effect of causing the absorption
of abnormal quantities of water, milk or cream," the word "absorption"
is not used in the sense of chemical absorption, and any butter is within
the definition which contains an abnormal quantity of water, whether by
chemical absorption or by incorporation.

4. SAME—ADULTERATED BUTTER SUBJECT TO TAX—INTENT OF MANUFACTURER.
    Butter containing an abnormal quantity of water is subject to the tax
imposed by Act May 9, 1902, c. 784, § 4, 32 Stat. 194 (U. S. Comp. St.
Supp. 1907, p. 637); the intent of the manufacturer being immaterial.

In Error to the Circuit Court of the United States for the Western
District of Michigan.

W. R. Keeney and L. H. Osterhouse, for plaintiff in error.

W. K. Clute, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge.  The plaintiff in error, as its corporate
name implies, was engaged at Coopersville, Mich., in the manufacture

163 F.—10

of creamery butter. It did not profess to be engaged in making or selling adulterated butter, and so took out no license and paid no tax as a maker of such butter. Upon the contrary, it claimed to be making the ordinary creamery butter of commerce, and not subject to the regulations or tax imposed upon makers of adulterated butter. Two car loads of butter made by it were examined by an agent of the Commissioner of Internal Revenue, and a very large proportion found to contain an abnormal percentage of water, which was therefore classified as "adulterated butter," as defined by the act of 1902. The Commissioner thereupon assessed taxes and penalties aggregating $1,620. This was paid under protest, and this action brought against the defendant in error, as collector, to recover the same. There was a jury and a verdict for the defendant.

The act of May 9, 1902 (32 Stat. 194, c. 784 [U. S. Comp. St. Supp. 1907, p. 637]), is an act which amends the act of August 2, 1886, known as the "Oleomargarine Act," [1] and also imposes a tax and provides for the inspection and regulation of the manufacture and sale of certain dairy products. Section 4 adopts the definition of butter contained in the oleomargarine act, wherein butter is defined as the "food product usually known as butter and which is made exclusively from milk or cream, or both, with or without common salt, and with or without additional coloring matter." The same section then proceeds to define what shall be deemed "adulterated butter." One class of such butter is thus defined:

"Or any butter in the manufacture or manipulation of which any process or material is used with intent or effect of causing the absorption of abnormal quantities of water, milk or cream."

Every person who engages in the production of "adulterated butter as a business" is declared to be a manufacturer, and required to pay a tax of $600 per year, and to pay a tax of 10 cents a pound when sold or removed for sale or consumption. Every manufacturer is required to give bond, put up signs, keep such books, and render such returns of material and product, "and to conduct his business under such surveillance of officers and agents as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may by regulation require." The mode of packing and marking such butter is also defined and the packages required "to be stamped and branded as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, shall prescribe." By one paragraph of the same section it is provided that the provisions of sections 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21 of the oleomargarine act "shall apply to the manufacturers of adulterated butter to an extent necessary to enforce the marking, branding, identification, and regulation of the exportation and importation of adulterated butter." Most of the sections referred to from the oleomargarine act deal with penalties for selling or receiving or removing the product without compliance with law as to stamping, branding, marking, etc. Section 14 provides for the employment of chemists and microscopists by the Commissioner to aid him in his duties, and that he shall be authorized to decide what substances, extracts, mixtures, or compounds which may be submitted

[1] Act Aug. 2, 1886, c. 840, 24 Stat. 209 (U. S. Comp. St. 1901, p. 2228).

for his inspection in contested cases are to be taxed under this act, and provides that his determination in matters of taxation "under this act shall be final." Section 20 provides:

"That the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may make all needful regulations for carrying into effect this act."

In addition to these provisions found in the act itself there are certain other provisions in the general law which bear upon the subject. They are found in sections 161, 251, and 3447, Rev. St. (U. S. Comp. St. 1901, pp. 80, 138, 2277). Section 251 is peculiarly in point, inasmuch as that authorizes the Secretary of the Interior "to make rules and regulations, not inconsistent with law, to be used under and in the enforcement of the various provisions of the internal revenue laws." In view of these provisions of law the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, promulgated a regulation that butter containing 16 per cent. or more of water, milk, or cream should be classified as adulterated butter under the act. Looking to the character of duties imposed upon the Commissioner of Internal Revenue, and the various provisions of law authorizing the promulgation of regulations for carrying out the plain purpose of the law, we entertain no serious doubt that this regulation was authorized.

The contention that the delegation of authority to promulgate such a regulation is to delegate either legislative or judicial power to an executive officer is founded upon a misapprehension of the character of the authority delegated. That Congress cannot delegate legislative authority or power to any executive official or board of officials is elementary. To do so would be destructive of our whole system and scheme of government. Field v. Clark, 143 U. S. 649, 691, 12 Sup. Ct. 495, 36 L. Ed. 294. That the delegation of authority to add to or take from a law would be to delegate legislative power must also be conceded. But that Congress may enact a law and delegate the power of finding some fact or state of things upon which the operation of the law is made to depend is equally clear. Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294; In re Kollock, 165 U. S. 526, 17 Sup. Ct. 444, 41 L. Ed. 813; Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525; Union Bridge Co. v. United States, 204 U. S. 364, 386, 27 Sup. Ct. 367, 51 L. Ed. 523. The authority to make all needful regulations not inconsistent with law is not a delegation of power to add something to an incomplete law nor a grant of judicial power. It is only an authority to determine the fact upon which the operation of the law is made to depend. Congress might have made the necessary tests and might have acquired the knowledge of the butter-making art to enable it to have enacted that adulterated butter should consist of butter having a moisture content of 16 per cent. or more. But that would have been an unnecessary detail, for it was altogether competent to declare that butter which contained an abnormal quantity of water, milk, or cream should be classified as adulterated butter, and that the fact as to what was, in dairy butter, an abnormal proportion of water, milk, or cream should

be determined by a regulation of the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury.

The cases cited above of Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294, In re Kollock, 165 U. S. 526, 17 Sup. Ct. 444, 41 L. Ed. 813, Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525, and Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523, are all cases in which authority to determine a fact or the happening of a contingency upon which the operation of a law was made to depend was delegated by Congress to executive officials and the validity of the legislation supported. The case of Field v. Clark involved the constitutionality of an act of Congress which provided for the admission of certain articles free of duty and the imposition of a duty upon the specified articles upon the happening of a contingency to be determined by the President and announced by his proclamation. The act was sustained as one not delegating legislative power. Upon this aspect of the case the court said:

"Legislative power was exercised when Congress declared that the suspension should take effect upon a named contingency. What the President was required to do was simply in the execution of the act of Congress. It was not the making of the law. He was the mere agent of the lawmaking department to ascertain and declare the event upon which its expressed will was to take effect."

Another instructive case is that of Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525, where was involved the validity of an act which made it unlawful for any person to bring into the United States any tea inferior in purity, quality, or fitness for consumption below the standards to be fixed and determined by a board of experts provided for by the act. The act was held valid as not vesting in the Secretary of the Treasury or the board of experts any real power of legislation. "Congress," said Justice White, speaking for the court, "legislated upon the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave the executive officials the duty of bringing about the result pointed out by the statute. To deny the power to Congress to delegate such a duty would, in effect, amount to declaring that the plenary power vested in Congress to regulate foreign commerce could not be efficiently executed."

The whole subject of the authority of Congress to authorize administrative officials to make rules and regulations for the enforcement of a law was again most fully and ably considered in the case of the Union Bridge Co. v. United States, 204 U. S. 364, 386, 27 Sup. Ct. 367, 51 L. Ed. 523. That case involved section 18 of the rivers and harbors act of 1899 (30 Stat. 1121, c. 425), providing for the removal or alteration of bridges which are unreasonable obstructions to navigation, after the Secretary of War shall have ascertained, after following the procedure laid down in the act, that they are such obstructions. The contention was that Congress could not delegate the power of deciding the fact as to whether a particular bridge was an obstruction to navigation. It was held that the act did not delegate either judicial or legislative power to the Secretary of War. Mr. Justice Harlan, for the court, among other things said:

"Beyond question, if it had so elected, Congress, in some effective mode and without previous investigation through executive officers, could have determined for itself primarily the fact whether the bridge here in question was an unreasonable obstruction to navigation, and, if it was found to be of that character, could by direct legislation have required the defendant to make such alterations of its bridge as were requisite for the protection of navigation and commerce over the waterway in question. But investigations by Congress as to each particular bridge alleged to constitute an unreasonable obstruction to free navigation, and direct legislation covering each case separately, would be impracticable in view of the vast and varied interests which require national legislation from time to time. By the statute in question Congress declared in effect that navigation should be freed from unreasonable obstructions arising from bridges of insufficient height, width ·of span, or other defects. It stopped, however, with this declaration of a general rule, and imposed upon the Secretary of War´the duty of ascertaining what particular cases come within the rule prescribed by Congress, as well as the duty of enforcing the rule in such cases."

The case of United States v. Eaton, 144 U. S. 677, 12 Sup. Ct. 764, 36 L. Ed. 591, is not in point. Eaton was indicted for violating a régulation made by the Commissioner of Internal Revenue requiring certain books to be kept by wholesale dealers in oleomargarine. The case arose under the eighteenth section of the oleomargarine act of 1886, prior to its amendment by the act of October 1, 1890. That section imposed certain penalties upon manufacturers and dealers who should knowingly and willfully "neglect or refuse to do, or cause to be done, anything required by law in the carrying on or conducting of his business, or shall do anything by this act prohibited." The court held that, while the regulation might be an entirely proper one under section 20 of the oleomargarine act of August, 1886, yet the question to be determined was whether a wholesale dealer in oleomargarine, who knowingly and willfully fails and omits to keep the book and make the monthly return prescribed in the regulation of the Commissioner of Internal Revenue, thereby fails and omits, within the meaning of section 18 of the act, to do a thing "required by law in the carrying on or conducting of his business," so as to be liable to the penalty prescribed by that section. After considering the sections of the act which deal with the things required from a manufacturer, but which impose no penalty for neglect to keep books and make returns, the court said:

"It would be a very dangerous principle to hold that a thing prescribed by the Commissioner of Internal Revenue as a needful regulation under the oleomargarine act for carrying it into effect could be considered a thing 'required by law' in the carrying on or conducting of the business of a wholesale dealer in oleomargarine, in such manner as to become a criminal offense punishable under section 18 of the act, particularly when the same act in section 5 requires the manufacturer of the article to keep such books and render such returns as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may by regulation require, and does not impose, in that section or elsewhere in the act, the duty of keeping such books and rendering such returns upon a wholesale dealer in the article. It is necessary that a sufficient statutory authority should exist for declaring any act or omission a criminal offense; and we do not think the statutory authority in the present case is sufficient. If Congress intended to make it an offense for wholesale dealers in oleomargarine to omit to keep books and render returns as required by regulations to be made by the Commissioner of Internal Revenue, it would have done so distinctly, in connection with an enactment

such as that above recited, made in section 41 of the act of October 1, 1890 (26 Stat. 62, c. 1244 [U. S. Comp. St. 1901, p. 2235]). Regulations prescribed by the President and by the heads of departments, under authority granted by Congress, may be regulations prescribed. by law, so as lawfully to support acts done under them and in accordance with them, and may thus have, in a proper sense, the force of law; but it does not follow that a thing required by them is a thing so required by law as to make the neglect to do the thing a criminal offense in a citizen, where a statute does not distinctly make the neglect in question a criminal offense."

This Eaton Case was explained and distinguished in both Caha v. United States, 152 U. S. 211, 14 Sup. Ct. 513, 38 L. Ed. 415, and In re Kollock, cited above, as a case in which the wrong was simply "in the violation of the duty imposed only by regulation of the treasury department." While it must be conceded that none of the provisions of the butter act, nor of the general law, in express terms confers authority to determine the per cent. of moisture in dairy butter which shall constitute adulterated or taxable butter, yet it is not easy to escape the conclusion, in view of the general character of the law and of the broad language in which the power to make needful rules to carry the law into execution is conferred, that there is an implied power to determine the fact as to what is an undue, unusual, or, in the words of the act, an "abnormal," incorporation of moisture. An express power to make departmental regulations involving the determination of facts upon which the operation of a law is made to depend is not essential. That which is plainly implied is as much the law as that which is expressed in plain terms. For the practical operation of the law it was deemed necessary that the department charged with its execution should have authority to make regulations not inconsistent with law, and this power was accordingly conferred in general terms. The regulation in question is reasonable, is not inconsistent with law, and we see no sufficient ground for saying that it is not within the fair scope and purview of the authority conferred. The cases of United States v. Bailey, 9 Pet. 238, 9 L. Ed. 113, and Caha v. United States, 152 U. S. 211, 14 Sup. Ct. 513, 38 L. Ed. 415, afford illustrations of regulations made under implied authority arising out of the nature of the duties imposed upon those charged with the execution of the law.

The conclusiveness of the determination of the fact upon which this law is made to depend would seem to follow from the authority under which it was made. The fact is one which Congress might have determined for itself. Obviously, if it did, that would be an end of the matter, and all butter which contained the moisture content so fixed, or more, would have been subject to the tax. In referring the determination of the fact to the administrative officials it has equally manifested its intent that the standard of excessive water content should be, when so determined, as conclusive as if named in the law itself. If in fixing the standard the Commissioner does not legislate by amending the law or altering it, nor act judicially by deciding a fact which was one which in its intrinsic nature required judicial determination, it is difficult to see, in the absence of fraud or bad faith, neither of which is here alleged, upon what theory a fact which Congress has submitted to his determination can be subject to review. The power of Congress to tax all butter, or only certain qualities of butter, is not

disputable, and is only qualified by the requirement of geographical uniformity. Wishing to tax certain grades of butter only, it delegated to an administrative board the determination of the question of fact as to what was an abnormal moisture content, and made that fact so settled the line between taxable and nontaxable butter. It is true that in McCray v. United States, 195 U. S. 27, 46, 24 Sup. Ct. 769, 49 L. Ed. 78, the court declined to determine the conclusiveness of the determination of the Commissioner as to what compounds or mixtures were subject to tax imposed upon oleomargarine, because not raised by any assignment of error. But the question has been more than once substantially decided in other cases. In Miller v. Mayor of New York, 109 U. S. 385, 3 Sup. Ct. 228, 27 L. Ed. 971, it was held that the determination by the Secretary of War that a bridge authorized by Congress, provided it should be constructed in such a way as not to be an obstruction to navigation, the fact to be determined by the Secretary of War upon plans submitted to him, was a conclusive determination of the fact so decided. It was urged that Congress could not give the determination of such a fact by an executive official any conclusive character as that involved the delegation of judicial power. To this the court replied:

"There is in this position a misapprehension of the purport of the act. By submitting the matter to the Secretary, Congress did not abdicate any of its authority to determine what should or should not be deemed an obstruction to the navigation of the river. It simply declared that, upon a certain fact being established, the bridge should be deemed a lawful structure, and employed the Secretary of War as an agent to ascertain that fact. Having power to regulate commerce with foreign nations and among the several states, and navigation being a branch of that commerce, it has control of all navigable waters between the states, or connecting with the ocean, so as to protect and preserve their free navigation. Its power, therefore, to determine what shall not be deemed, so far as that commerce is concerned, an obstruction, is necessarily paramount and conclusive. It may in direct terms declare absolutely, or on conditions, that a bridge of a particular height shall not be deemed such an obstruction, and in the latter case make its declaration take effect when those conditions are complied with. The act in question, in requiring the approval of the Secretary before the construction of the bridge was permitted, was not essentially different from a great mass of legislation directing certain measures to be taken upon the happening of particular contingencies or the ascertainment of particular information. The execution of a vast number of measures authorized by Congress and carried out under the direction of heads of departments would be defeated if such were not the case. The efficiency of an act as a declaration of legislative will must, of course, come from Congress; but the ascertainment of the contingency upon which the act shall take effect may be left to such agencies as it may designate. South Carolina v. Georgia, 93 U. S. 13, 23 L. Ed. 782."

Congress forbade the importation of teas which should not conform in quality and purity to standards of admissible teas to be determined by the Secretary of the Treasury upon the advice of a board of experts. The act was upheld as not involving anything more than the delegation of authority to the Secretary of the Treasury to determine the fact upon which the operation of the law was made to depend. Buttfield v. Stranahan, 192 U. S. 470, 497, 24 Sup. Ct. 349, 48 L. Ed. 525. The effect of fraud, bad faith, or malice in the adoption of the standard of admissible tea the court said they were not called upon

to consider, as no allegation of bad faith in fixing the standards had been made.

In Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523, the Secretary of War had determined upon evidence submitted to him that a particular bridge was an obstruction to navigation and required its destruction in accordance with an act of Congress which forbade the maintenance of any bridge which was an obstruction. The court held that his action did not involve either the exercise of legislative or judicial power. The court in that case said:

"In performing that duty the Secretary of War will only execute the clearly expressed will of Congress, and will not, in any true sense, exert legislative or judicial power. He could not be said to exercise strictly legislative or judicial power any more, for instance, than it could be said that executive officers exercise such power when, upon investigation, they ascertain whether a particular applicant for a pension belongs to a class of persons who, under the general rules prescribed by Congress, are entitled to pensions. If the principle for which the defendant contends received our approval, the conclusion could not be avoided that executive officers, in all the departments, in carrying out the will of Congress as expressed in statutes enacted by it, have from the foundation of the national government exercised and are now exercising powers, as to mere details, that are strictly legislative or judicial in their nature. This will be apparent upon an examination of the various statutes that confer authority upon executive departments in respect of the enforcement of the laws of the United States. Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends would be 'to stop the wheels of government' and bring about confusion, if not paralysis, in the conduct of the public business."

But, if not conclusive in a contested case, the regulation was at least a working regulation and guide, enabling the officials charged with the enforcement of the law to act with impartiality and uniformity in exacting the tax imposed. Its promulgation was at least an assurance to people engaged in butter making that the administrative officials charged with the collection of this tax would not subject them to the tax or a departmental regulation of their business if their butter did not contain as much as 16 per cent. of moisture, and a warning against any greater percentage. This much must be conceded. Assuming, then, that it may not have the force of law as a conclusive determination of the question, does it follow, if the tentative or prima facie determination of the Commissioner by such a regulation is challenged by a manufacturer from whom the tax is exacted, that the act is to fail because in such circumstances there can be no final determination of the fact of what is abnormal moisture in butter? It may be that such a question, involving as it does more or less of scientific knowledge and a wide acquaintance with the moisture content of standard butter, could be more satisfactorily determined by a commission of experts or by the action of Congress itself. But does it follow that such a question could not be submitted to a jury when the enforcement of the tax is involved and the maker of the butter contests the fact of an abnormal moisture content? That juries might disagree with one another as to a normal water content, and so some would be compelled to pay and others escape, may be conceded. But is not this so with respect to many questions which for centuries have gone to the jury? By

what standard is a question of fraud to be tried? What is the definite fixed standard of care by which juries are to determine negligence? We tell them the care of the average prudent man is the standard. But can that be said to afford an identical idea to the mind of every juror? Questions of motive and intent are questions for the jury. Questions involving scientific knowledge far beyond that of the best class of jurymen are submitted, although the verdict may afford no standard for another case and questions depending on science are peculiarly capable of an exact and uniform answer. Manifestly this objection is not maintainable, unless it be that as an excise tax it will lack that uniformity of operation required by the Constitution, because the verdict of one jury will afford no standard for another. But it is the peculiar province of a jury to determine disputed questions of fact. The question as to what is an abnormal moisture content in dairy butter is nothing more or less than a question of fact. If the fact exist by confession or by the determination of a jury, the butter is subject to the tax. If the fact is not in some way established, the butter is not taxable. To reply that, because all juries may not agree that a particular moisture content is essential to constitute abnormal moisture, therefore the law will lack in that uniformity essential to an excise tax, is to say that constitutional uniformity in a tax is dependent upon its intrinsic uniformity—upon its genuine equality of burden. But the provision requiring uniformity in respect to duties, imports, and excises does not mean that the burden of the duty or tax shall rest with uniformity upon all individuals or states. A tax is uniform which falls upon the same article in all parts of the country. In Knowlton v. Moore, 178 U. S. 42, 106, 20 Sup. Ct. 747, 44 L. Ed. 969, Justice White, after an interesting historical consideration of the meaning of the clause requiring uniformity, speaking for the court, said:

"By the result of an analysis of the history of the adoption of the Constitution it becomes plain that the words 'uniform throughout the United States' do not signify an intrinsic, but simply a geographical, uniformity."

The objection arising out of the possibility of contradictory judgments upon like evidence as to what water content is normal, and the fact that one might be taxed and another escape, does not affect this matter of geographical uniformity. As observed by Mr. Justice Miller in the Head Money Cases, 112 U. S. 581, 595, 5 Sup. Ct. 247, 252, 28 L. Ed. 798:

"Perfect uniformity and perfect equality of taxation, in all the aspects in which the human mind can view it, is a baseless dream, as this court has said more than once."

If therefore, we err in holding the determination of the fact upon which the operation of the law was made by Congress to depend as conclusive when determined by the Commissioner of Internal Revenue, we think there was no error in submitting the matter to the jury. That the court instructed the jury that the regulation of the department was not conclusive cannot be complained of by the plaintiff in error. That he told the jury that the regulation was evidence of a "high character," which might be looked to along with all the other evidence, is not excepted to or assigned as error. The error relied upon as raising

the questions we have discussed is for the refusal of the court to charge the second request by the plaintiff in error, being the seventh assignment of error. That request required the court to instruct the jury, not only that the commissioner had not the authority to fix the per. cent. of moisture which would subject butter to taxation, but that they must find for the plaintiff because the act did not itself fix such abnormal moisture content. By direction of the court the jury specially found, upon all of the evidence, that butter having 16 per cent. or more of moisture was butter with an abnormal water content, and that the butter of the plaintiff in error, here involved, had 16 per cent. or more of water, and was adulterated butter under the act, and liable to the tax and penalties imposed. This state of the record relieves the case of some of its difficulties; for, if the regulation of the department be conclusive as a matter of law, the submission of the question to the jury as one of fact was without harm. If, upon the other hand, the question of fact as to what is an abnormal quantity of water, milk, or cream in butter is one of fact for the jury, the plaintiff in error cannot complain, unless there was some error in the submission or rejection of evidence or in the charge of the court, duly excepted to and duly assigned as error.

Counsel have assigned as error that the court declined to instruct as requested by their fourth request, the subject of the ninth assignment of error, which request was as follows:

"I also charge you, gentlemen of the jury, that the word 'absorption,' used in the definition of adulterated butter I have given you, does not mean incorporation; and if you find from the evidence in this case that butter fat will not absorb 15.99 per cent. of water, and does not absorb to exceed 1 per cent. of moisture, and that all the other water content is held by incorporation, then I charge you that your verdict will be for the plaintiff."

The charge upon this subject meets with our approval. It is as follows:

"Now you will notice that there has been a great deal of discussion throughout the case as to the meaning of certain terms. Among the terms in question is the word 'absorption,' and it has been contended that that word must apply only to the water taken into the butter by the chemical process of absorption, as distinguished from incorporation. It has appeared by the testimony of one of the witnesses that less than one-half of 1 per cent. of water can be taken by what is chemically called absorption. That is not the only definition of the word 'absorb.' A very proper definition as given by the dictionaries, the standard dictionaries, is to 'draw in as a constituent part.' It is inconceivable that the government would have passed a statute against adulteration where less than one-half of 1 per cent. of water could have been absorbed and treated as absorption in a chemical sense, and you are instructed as the law of this case that it is the intent of this statute to make adulterated butter, which by any process is made to contain an abnormal amount of water, whether that is obtained by what is called chemical absorption, or by incorporation, or any other method of that kind. If, by the process of making that butter, there is left in it more than a normal amount of water, it is adulterated within the meaning of the statute."

Upon the subject of the intent of the plaintiff, the court charged the jury as follows:

"Then the expression 'any process' used: Now, that does not mean necessarily that there has to be some special fraudulent process of making the

butter, but if the process of making, whether by too little washing or too much washing, or too little churning or too much churning, or whatever it is that has the effect of leaving an abnormal quantity of water in the butter, it is within the statute, and within the prohibition of the statute. And again as to the intent: In this case, it is not material what the intent of the Coopersville Co-operative Creamery Company was—whether the Coopersville Co-operative Creamery Company intended to have an undue amount of water left in its butter. If the process as employed did have that effect, the company was just as much liable for that tax as if it did it intentionally, because it is the object of the law to prevent that thing being done."

The plaintiff's request, made the subject of its eighth assignment of error, was in conflict with this, and was rightly denied.

The other assignments have been considered. None of these are well taken.

Judgment affirmed.