## UNITED STATES v. FRANK et al.

### (District Court, S. D. Ohio, W. D. January 21, 1911.)

### No. 747.

1. FOOD (§ 20*)—FOOD AND DRUGS ACT—VIOLATION—INFORMATION.

An information alleging that defendants shipped in interstate commerce an article of food labeled as "Extract Terpeneless Lemon" in which a dilute solution of alcohol and water was substituted in part for said terpeneless lemon extract so that the same contained no more than .05 per cent of citral derived from the oil of lemon whereas, as recognized in the trade generally and by the standard of purity established by the Secretary of Agriculture in circular No. 19, issued by authority of Act March 3, 1903, c. 1008, 32 Stat. 1158, such extract should contain at least

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

.2 per cent by weight of such citral, states facts which will sustain counts for both adulteration and misbranding in violation of Food and Drugs Act June 30, 1906, c. 3915, § 2, 34 Stat. 768 (U. S. Comp. St. Supp. 1909, p. 1188).

[Ed. Note.—For other cases, see Food, Dec. Dig. § 20.*]

2. FOOD (§ 12*)—FOOD AND DRUGS ACT—VIOLATION BY ADULTERATION.

The standards of purity for food products established by the Secretary of Agriculture in circular No. 19 of the department, issued by authority of Act March 3, 1903, c. 1008, 32 Stat. 1158, governs in determining what constitute adulterations of such products under Food and Drugs Act of June 30, 1906, c. 3915, 34 Stat. 768 (U. S. Comp. St. Supp. 1909, p. 1187).

[Ed. Note.—For other cases, see Food, Dec. Dig. § 12.*

What constitutes a violation of pure food regulations, see note to Brina v. United States, 105 C. C. A. 559.]

Criminal prosecution by the United States against Jacob Frank, Charles Frank, and Emil Frank, trading as the Frank Tea & Spice Company. Judgment on plea of guilty.

On or about March 21, 1909, Jacob Frank, Charles Frank, and Emil Frank, trading under the firm name and style of the Frank Tea & Spice Company, shipped from the state of Ohio into the state of Kentucky a quantity of so-called lemon extract labeled, "P. & S. Brand Extract Terpeneless Lemon—Artificially Colored. The Frank Tea & Spice Co., Cincinnati, O." An analysis of a sample of this product by the Bureau of Chemistry, United States Department of Agriculture, was made with the following results: "Polarization, 0.0; lemon oil by precipitation, none; lemon oil by polarization, none; color, naphthol yellow S, artificial; citral, 0.05 per cent; and alcohol, 49.1 per cent." As the finding of the analyst and report made showed that the product was adulterated and misbranded within the meaning of Food and Drugs Act June 30, 1906, c. 3915, 34 Stat. 768 (U. S. Comp. St. Supp. 1909, p. 1187), the said Jacob Frank, Charles Frank, and Emil Frank, and the parties from whom the samples were procured were afforded opportunities for hearings. As it appeared after hearings held that the said shipment was made in violation of the act, the Secretary of Agriculture reported the facts to the Attorney General with a statement of the evidence upon which to base a prosecution. In due course a criminal information was filed in the District Court of the United States for the Southern District of Ohio against said Jacob, Charles, and Emil Frank, charging the above shipment and alleging that the product so shipped was adulterated in the following particulars, to wit:

First. That another substance, to wit, a dilute solution of alcohol and water, was substituted in part for the terpeneless lemon extract, in that said article, represented to be terpeneless lemon extract, contained no more than 0.05 per cent of citral derived from the oil of lemon, whereas terpeneless lemon extract should contain 0.2 per cent of citral derived from oil of lemon, according to the standards of purity for food products, established by the Secretary of Agriculture of the United States, in accordance with the provisions of the act of Congress approved March 3, 1903, c. 1008, 32 Stat. 1158.

Second. That a dilute solution of alcohol and water was mixed and packed with said article of food so as to reduce and lower and injuriously affect its quality and strength. The information further alleged that the aforesaid product was misbranded in that the statement, to wit, "extract terpeneless lemon," was false, misleading, and deceptive, as said article of food did not contain 0.2 per cent of citral derived from lemon, but contained only 0.05 per cent of said citral, and therefore was not terpeneless lemon extract as recognized in the trade generally and in the standards

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of purity for food products established by the Secretary of Agriculture of the United States in collaboration with the Association of Official Agricultural Chemists.

On October 11, 1910, the above-named defendants pleaded guilty to the above information, and to the allegations of adulteration and misbranding in manner and form as alleged therein, whereupon the court imposed a fine of $200 and costs.

On a motion of counsel for defendants the court took its decision under reconsideration and briefs were filed by the defendants' counsel and by the United States attorney.

Sherman T. McPherson, U. S. Atty., and E. P. Moulinier, Asst. U. S. Atty.

A. W. Goldsmith, Jr., for defendants.

HOLLISTER, District Judge (after stating the facts as above). The United States filed an information against Jacob Frank, Charles Frank, Emil Frank, doing business under the firm name and style of the Frank Tea & Spice Company, charging them with having unlawfully shipped and delivered for shipment from Cincinnati to a firm at Mt. Sterling in Kentucky, one gross bottles of a certain article of food purporting to be terpeneless lemon extract, marked "P. & S. Brand Extract Terpeneless Lemon—Artificially Colored. The Frank Tea & Spice Co., Cincinnati, O.," and that same was adulterated in that a dilute solution of alcohol and water was substituted in part for said terpeneless lemon extract so that the same contained no more than .05 per cent of citral derived from the oil of lemon; whereas, it should contain at least .2 per cent by weight of citral derived from the oil of lemons, as required by the standards of purity for food products, established by the Secretary of Agriculture in accordance with the provisions of the Act of Congress, approved March 3, 1903, c. 1008, 32 Stat. 1158. The information also charged that the dilute solution of alcohol and water was mixed and packed as and with said article of food so as to reduce and lower and injuriously affect the quality and strength of the article of food purporting to be terpeneless lemon extract. For a second count the information charges that the article of food called "terpeneless lemon extract" was misbranded in that the statement on the bottles that the article contained therein was extract terpeneless lemon was false and misleading in that the article did not contain at least .2 per cent of oil product by weight of citral derived from the oil of lemon, and did in fact contain only .05 per cent of citral, and that the same was not terpeneless lemon extract as recognized in the trade generally and in the standards of purity of food products established by the Secretary of Agriculture in collaboration with the Association of Official Agricultural Chemists, approved by Act of Congress, March 3, 1903, c. 1008, 32 Stat. 1158. The defendants, believing, as admitted in open court, that only a nominal fine would be imposed upon a plea of guilty as for a technical violation of the pure food law, pleaded guilty. The defendants having within some six or seven months prior to the filing of this information pleaded guilty to two so-called technical violations of the pure food law, and being thereupon fined only in nominal amounts, the court on this plea imposed a fine of $200. Thereupon the defend-

ants deeming themselves aggrieved, and upon the urgent solicitation of their counsel, the court permitted counsel to file a brief in support of the proposition that no offense in fact had been committed under the laws of the United States. Counsel for the defendants submitted an elaborate brief to which the District Attorney filed a brief in answer.

[1] Upon consideration of these the court is of opinion that there is an offense against the laws of the United States charged in this information, and sees no reason why, under the circumstances of the case, the fine imposed was too large.

On March 3, 1903, the Congress appropriated a sum of money to the Department of Agriculture for the fiscal year ending June 30, 1904, for the purpose, among others, "to enable the Secretary of Agriculture, in collaboration with the Association of Official Agricultural Chemists, and such other experts as he may deem necessary, to establish standards of purity for food products and to determine what are regarded as adulterations therein, for the guidance of the officials of the various states and of the courts of justice. * * *" The information alleges that the standard of purity for terpeneless lemon extract was established by the Secretary of Agriculture and it appears aliunde that in the publication of Department of Agriculture, Circular No. 19, the following:

"Terpeneless extract of lemon is the flavoring extract prepared by shaking the oil of lemon with dilute alcohol, or by dissolving terpeneless oil of lemon in dilute alcohol, and contains not less than two-tenths (0.2) per cent by weight of citral derived from oil of lemon."

[2] That the Secretary of Agriculture had the constitutional power under the act of 1903 to establish standards for purity of food products is not disputed, nor could it be under the decisions of the Supreme Court of the United States. He adopted the standard for the article of food in question as alleged in the information. The allegation of the information is that the standard so established was existent at the time of the filing of the information. On June 30, 1906 (Act June 30, 1906, c. 3915, § 2, 34 Stat. 768 [U. S. Comp. St. Supp. 1909, p. 1188]), the Congress provided:

"That the introduction into any state * * * from any other state * * * any article of food * * * which is adulterated or misbranded" (within the meaning of this act) "is hereby prohibited." And the offender, "shall be guilty of a misdemeanor and for such offense be fined not exceeding two hundred dollars for the first offense, and upon conviction for each subsequent offense not exceeding three hundred dollars or be imprisoned not exceeding one year, or both, in the discretion of the court."

The act further provides that an article shall be deemed to be adulterated in the case of food, "if any substance has been mixed and packed with it so as to reduce or lower or. injuriously affect its quality and strength," and shall be deemed to be misbranded, "if the package containing it or its label shall bear any statement, design, or device regarding such article or the ingredients or substances contained therein which shall be false or misleading in any particular."

The claim of the defendants is that the statute does not distinctly

incorporate the standards fixed by the Secretary of Agriculture within the provisions of the food law, and it does not therefore define a criminal offense. The answer to this is that if the Secretary of Agriculture had the power to fix standards and did fix a standard of this food product, which standard was in existence at the time the food law was passed, and the information charges wherein the article was adulterated and misbranded with respect to this standard, there seems to be no room for doubt that if upon proof that the article did not conform to the requirements of the standard of purity established by the Secretary of Agriculture, then an offense has been charged under the laws of the United States.

The defendants claim that the act of 1903 was a mere appropriation law, but it would seem that a law appropriating a certain sum of money to the Secretary of Agriculture for the purpose of doing certain things which he could constitutionally do for the purpose of fixing standards of purity of food and that he did so fix them, carries with it a necessary implication that he could do that for which the money was appropriated to him for the purpose of doing, and when he fixed the standards then those standards prevailed unless they have been changed since. It does not appear that they have been changed.

The defendants claim that as the act of 1906 does not incorporate the standards fixed by the Secretary of Agriculture, the act of the Secretary was legislative in character, and hence no criminal offense could be predicated upon it. It is also claimed that since the act of 1906, in describing drugs, refers to the Pharmacopœia or National Formulary, and in describing what food is, refers to no standard at all, Congress has not fixed any standard for food. Both of these claims are based on a misapprehension. Section 6 of the act of 1906 provides:

"That the term 'drug,' as used in this act, shall include all medicines and preparations recognized in the United States Pharmacopœia or National Formulary for internal or external use, and any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of diseases of either man or other animals. The term 'food,' as used herein, shall include all articles used for food, drink, confectionery, or condiment by man or other animals, whether simple, mixed, or compound."

These are mere terms of description. If the Pharmacopœia or National Formulary says something is a drug, it is a drug under the meaning of the act. Or if it comes under the other description of what a drug is, it is a drug, and so food also is described. There are no standards fixed in either case, for, if any substance or mixture is intended to be used for the cure, mitigation, or prevention of disease of either man or other animals, it is nevertheless a drug whether it is recognized in the Pharmacopœia or National Formulary or not. The standard for food was fixed by the Department of Agriculture under the act of 1903. If one in the business of making food products would look for the standard he would find it in the promulgations of the Secretary of Agriculture made under direct authority of Congress. The act of 1903 does not describe any offense, but the act of 1906 says that if any article of food adulterated or misbranded is manu-

factured or transported so as to become the subject of interstate commerce, the maker, transporter, etc., shall be guilty of an offense. How shall it be known whether he is guilty of an offense or not? The answer is clear, by referring to the standards which have been established under the authority of Congress. The Secretary of Agriculture, under authority of Congress, fixed the standards of purity for certain foods. This is a fact upon which the law of 1906 operates. It is not a law. The law of 1906 under which the offense is charged to have been committed says what food is. The offense charged is that the defendant transported a food and that it was adulterated and misbranded. How is this to be ascertained? By looking to the standard as a fact.

The question is dealt with in Coopersville Co-operative Creamery Co. v. Lemon, 163 Fed. 145, 89 C. C. A. 595. It appears that the Oleomargarine Act May 9, 1902, c. 784, § 4, 32 Stat. 194 (U. S. Comp. St. Supp. 1907, p. 637), provides that "any butter in the manufacture or manipulation of which any process or material is used with intent or effect of causing the absorption of abnormal quantities of water, milk or cream" shall be deemed "adulterated butter," and authorizes the Commissioner of Internal Revenue to decide what substances are taxable thereunder. It also authorizes him, with the approval of the Secretary of the Treasury, to make all needful regulations for carrying the act into effect. It was held that such a regulation, providing that butter containing 16 per cent. or more of water, milk or cream should be classified as "adulterated butter" under the act, was within the authority so granted, and was valid, being neither an exercise of legislative or judicial power, but merely a determination as a question of fact of what constitutes an "abnormal" quantity of water, etc., upon which the application of the statute is made to depend.

Judge Lurton, speaking for the Circuit Court of Appeals says:

"The contention that the delegation of authority to promulgate, such a regulation is to delegate either legislative or judicial power to an executive officer is founded upon a misapprehension of the character of the authority delegated. That Congress cannot delegate legislative authority or power to any executive official or board of officials is elementary. To do so would be destructive to our whole system and scheme of government. Field v. Clark, 143 U. S. 649, 691, 12 Sup. Ct. 495, 36 L. Ed. 294. That the delegation of authority to add to or take from a law would be to delegate legislative power must also be conceded. But that Congress may enact a law and delegate the power of finding some fact or state of things upon which the operation of the law is made to depend is equally clear. Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294; In re Kollock, 165 U. S. 526, 17 Sup. Ct. 444, 41 L. Ed. 813; Union Bridge Co. v. United States, 204 U. S. 364, 386, 27 Sup. Ct. 367, 51 L. Ed. 523. The authority to make all needful' regulations not inconsistent with law is not a delegation of power to add something to an incomplete law nor a grant of judicial power. It is only an authority to determine the fact upon which the operation of the law is made to depend. Congress might have made the necessary tests and might have acquired the knowledge of the butter-making art to enable it to have enacted that adulterated butter should consist of butter having a moisture content of 16 per cent. or more. But that would have been an unnecessary detail, for it was altogether competent to declare that butter which contained

an abnormal quantity of water, milk, or cream should be classified as adulterated butter, and that the fact as to what was, in dairy butter, an abnormal proportion of water, milk, or cream should be determined by a regulation of the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury."

It surely can make no difference that the authority to establish the standard was not in the act itself creating the offense as in the oleomagarine law. It may be well said that the food and drugs act of 1906 was made with special reference to the standards of food fixed by the Secretary of Agriculture under prior authority of Congress.

It is true that the case of United States v. St. Louis Coffee & Spice Mills, 189 Fed. 191, decided May 22, 1909, in the District Court for the Eastern District of Missouri, bears out the contention of the defendant, but in a subsequent case, United States v. Edward Weston Tea & Spice Company, decided November 30, 1909, the same court submitted to the jury a case necessarily involving the same question. If he at that time entertained the opinion expressed in the other case he would not have permitted the case to go to the jury. The court is of opinion that the information charges an offense. There is some doubt in the court's mind as to the propriety of passing upon this question of law at all. The defendant before pleading guilty had the opportunity to demur to the information, and, having many months in which to make up his mind what to do, pleaded guilty. Not until the imposition of a fine unexpectedly large did he raise the question here discussed. It is probable that the fine having been imposed on the plea of guilty the matter has passed from the power of the court to the pardoning power. The court has no intention of making this case a precedent which may be followed in similar cases. If persons charged with an offense against the laws of the United States with ample time to prepare their defense, assisted by able counsel, nevertheless pleaded guilty and a fine was imposed, it is difficult to see upon what ground they have right to appeal to the court by an attack upon the legality of the proceeding.

The court has only looked into the subject lest some injury has come to the defendants through their own plea of guilty.

The food and drugs act is one of the most beneficent legislative enactments of recent times and its provisions must be observed.