## THALER v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. December 12, 1919.)

### No. 3325.

1. WAR ⨎4—AIDING PROSTITUTION IN VICINITY OF CANTONMENT.

   Evidence *held* to sustain a conviction for aiding and abetting prostitution within distance from army cantonment prescribed by Selective Draft Act, § 13, as amended by Act July 9, 1918 (Comp. St. 1918, § 2019b), and regulations made thereunder, by transporting persons and aiding them to find bawdyhouse.

2. DISORDERLY HOUSE ⨎4—WHAT CONSTITUTES BAWDYHOUSE.

   To constitute a house a "bawdyhouse" it is not necessary that it supply the prostitutes, or cater only to the lecherously disposed, but·is sufficient if persons are knowingly permitted to frequent it for the purpose of unlawful intercourse, although such character is not generally known, except to those lasciviously inclined and to panderers.

3. CRIMINAL LAW ⨎369(2)—EVIDENCE OF OTHER OFFENSE.

   Where the substance of the offense charged was the taking of persons by defendant to a hotel for purposes of prostitution, evidence that such persons were there served with liquor in their rooms *held* relevant.

4. DISORDERLY HOUSE ⨎2—"BAWDYHOUSE"; "BROTHEL"; "HOUSE OF ILL FAME."

   In the general popular acceptation of the terms, "bawdyhouse," "brothel," and "house of ill fame" are synonymous (citing Words and Phrases, Bawdyhouse; House of Ill Fame).

In Error to the District Court of the United States for the Southern District of Ohio; Howard C. Hollister, Judge.

---

⨎For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Criminal prosecution by the United States against Meyer Thaler. Judgment of conviction, and defendant brings error. Affirmed.

Hiram C. Bolsinger, of Cincinnati, Ohio, for plaintiff in error.
Allen C. Roudebush, of Cincinnati, Ohio, for the United States.

Before KNAPPEN and DENISON, Circuit Judges, and KILLITS, District Judge.

KNAPPEN, Circuit Judge. Plaintiff in error was indicted under section 13 of the Selective Service Act of May 18, 1917 (40 Stat. 76, c. 15)—the section was amended by subchapter 14 of chapter 143 (Act July 9, 1918, 40 Stat. 885 [Comp. St. 1918, § 2019b])—for the suppression and punishment of prostitution, etc., near cantonments, as affected by the order of the Secretary of War (evidenced by bulletin of the War Department of January 17, 1918), which, so far as here important, designated five miles as the reasonable distance from military places within which the condemnation should apply. The indictment charged that defendant, within five miles of the military camp known as Ft. Thomas (situated at Ft. Thomas, Ky.), did—

"direct, take, and transport certain persons, to wit [two men and two women named] for immoral purposes, to wit, for the purposes of lewdness, assignation and prostitution, and to assist said persons for such purpose to find a house of illfame, brothel and bawdyhouse, to wit, the rooms and house known as [giving the name and location of a hotel in Cincinnati], and the said Meyer Thaler then and there well knowing and having reasonable cause to know the character of said house to be that of a house of ill fame, brothel and bawdyhouse."

Neither the sufficiency of the indictment nor the effectiveness of the statute and regulation upon which it is based is challenged.[1] There was trial by jury, resulting in conviction, and judgment thereon.

1. Plaintiff in error contends that there was no testimony tending to show that he took the parties named to the hotel for the purposes charged in the indictment, or that he had reasonable cause to know that the character of the house was as charged, or that it was in fact used for such immoral purposes. These questions are raised under a denial of a motion, at the close of the testimony, for directed verdict.

There was substantial testimony to the effect that the two men (who were soldiers in uniform) met the two women (who were before that unknown to them) on a railroad train going to Cincinnati; that on arriving at the depot in that place one of the men asked the defendant (who was a taxicab driver) if he knew of some hotel in the outskirts of the city where it was quiet, and where they would not be bothered or interrupted, and that defendant replied that he did; that the four parties then entered the taxicab, and that during the ride to the hotel the soldier referred to told defendant that he and the other soldier had "picked these two women up on the train in West Virginia and were out for a good time"; that on arriving at the hotel defendant said he would go in and see if it was all right; that after three or

---

[1] See Coopersville Co. v. Lemon (C. C. A. 6) 163 Fed. 145, 89 C. C. A. 595, and cases cited.

four minutes defendant came out of the hotel and said, "All right, come on in" (one of the girls testified that the soldier first named went in with defendant, and that "they both came out of the hotel and said everything was all right and safe"), and that all four of the parties thereupon entered the hotel; that the soldier first referred to paid the room rent for all four parties in advance; that they "did not make it known to the hotel people their purpose in coming," but that "no questions were asked" the girls or any other of the parties; that the two couples registered, respectively, as husband and wife, and were assigned to adjoining rooms, wherein the respective couples had sexual relations; that after the four had gone to their rooms they were furnished whisky and at other times beer, brought in by the bell boy, once at least on an open tray, and once at least the bottled beer being wrapped in paper—the bell boy being each time called for, and each time receiving the pay direct.

There was also testimony that, after the arrest, defendant, in answer to a question by a government officer whether he knew that these people were unmarried, replied that he "knew they wasn't married, but it wasn't up to me to question them." Defendant also admitted that he was in the habit of receiving 25 cents for each passenger taken to the hotel in question (having the same arrangement with another hotel), and that he received the agreed payment in connection with the delivery at the hotel of the four persons named.

A detective in the employ of the city of Cincinnati testified that on going to the hotel on the night in question with the juvenile officer he found one of the two couples in question "in bed and the other in their room"; that he "could not say that the hotel had a reputation for renting rooms for immoral purposes," but that he had "instructions to go through the cabaret of that hotel for the purpose of picking out prostitutes and other undesirables; that there also congregated there pimps, who are men that live with women, or off of the shame of women; and that these people would visit the cabaret or lobby whenever we went in there, and we tried to get them out of the lobby." This practice applied, not only to the hotel in question, but to all other hotels having cabarets.

Another detective, who was a member of the Cincinnati police vice squad at the time in question, testified that at that time the reputation of the hotel for renting rooms to people for immoral purposes was bad, and that "there were prostitutes and pimps hanging around the place," stating, however, on cross-examination, that he did not know that it had "a reputation for women to go for immoral purposes," and that on the date in question the hotel "was not known as a house of ill fame or bawdyhouse," and that he knew of no other arrest being made therein for renting rooms for immoral purposes.

Another policeman testified, in substance, that it "was generally conceded, among the boys of the police department, that things were a little loose around" the hotel; that if "anything immoral went on in the house that it did not have that appearance among the public, and that the boys in the department were under the impression that it was not hard to put over, and that it needed a little attention." There was

also testimony that the house detective of the hotel, whose duties were "to look after the house and see that there were no suspicious persons or undesirables known to him to visit the place," had a bad reputation, was known to be living off the earnings of a woman known as a prostitute, and was known as a "pimp," and that before he became the house detective "he lived off of a woman on the line, meaning the red light district." As affecting the motion to direct verdict, we have, of course, stated the testimony in the aspect most favorable to the government.

[1] We think the motion to direct verdict was properly denied. There was testimony directly tending to show that plaintiff in error knowingly and intentionally took the four persons to the hotel to assist the purpose for which they desired the accommodations. There was also substantial testimony which would reasonably sustain an inference (although not conclusive) that the character of the hotel at the time was as charged; that is to say, that persons of opposite sexes were permitted to obtain rooms with knowledge of the intended purpose of lewdness, assignation, or prostitution, or with reasonable cause to believe that such was the purpose, and that it was resorted to for such purpose. This inference of the character of the hotel received support from the testimony of the policeman and detectives referred to. Support was added by the history of the instant transaction, which also tends to justify an inference that plaintiff in error was acquainted with such character.

[2] To constitute a place a bawdyhouse, it is not necessary that such house supply the prostitutes, nor that it cater only to the lecherously disposed. A house is bawdy, if persons are knowingly permitted to frequent it for the purpose of unlawful sexual intercourse (see People v. Gastro, 75 Mich. 127, 133, 42 N. W. 937), although such character is not generally known, save to the lasciviously inclined and to panders. If prostitution, in the sense of involving pecuniary reward, is thought essential (there are authorities both ways), it is enough to say that the testimony in the instant case would support an inference of prostitution, although the record is silent as to money payment, as such, to the women.

[4] Although in one or more jurisdictions proof of reputation seems to be necessary to constitute a "house of ill fame," and while in some jurisdictions proof of general reputation is permitted in support of a charge of keeping a house of that character (although in others it is not), yet in general popular acceptation the terms "bawdyhouse," "brothel," and "house of ill fame" are synonymous (see Century Dictionary); and in many jurisdictions they are held to be such (4 Words and Phrases, title "House of Ill Fame"; 1 Words and Phrases, title "Bawdyhouse," and cases cited; State v. Boardman, 64 Me. 523, 529; State v. Keithley, 142 Mo. App. 417, 423, 127 S. W. 406). In the statute here involved, the words are, "house of ill fame, brothel or bawdyhouse." An allegation that the hotel was a "bawdyhouse" would thus have been sufficient, and the indictment as drawn was satisfied, so far as the description of the house is concerned, by proof that it was a

"bawdyhouse"; a finding to that effect being necessarily covered by the verdict.

The statute makes it an offense "to aid or abet prostitution," even though there is no resort to a bawdyhouse, brothel, or house of ill fame. The gist of the offense charged is the assisting of the four persons in question to find (and be received in) a house of such character that their lustful purposes could therein be carried out. The three characterizations used in the indictment were merely descriptive of one and the same offense, and defendant could not have been prejudiced by the inclusion of the words "house of ill fame," even were the proof thought to be lacking as to such character, if to be distinguished from the other character assigned. Bennett v. United States (C. C. A. 6) 194 Fed. 630, 633, 114 C. C. A. 402; Daniels v. United States (C. C. A. 6) 196 Fed. 459, 464, 116 C. C. A. 233.

[3] 2. There was no error in refusing to strike out the testimony that liquor was furnished the party, notwithstanding defendant was not present at that time. While neither he nor the hotel men were on trial for selling liquor (it was an offense to sell liquor to a soldier in uniform), the testimony that liquor was furnished was a natural part of the narrative of the entire occurrence; it bore upon the credibility of the story of the transaction in the vital respects involved; that the proof was strong enough without it did not render it irrelevant, and we cannot say that the furnishing of several orders of liquor to a party so composed, in a private room, had no tendency to support a conclusion that rooms were being let for purposes of illicit sexual relation. The fact that the liquor was ordered from and paid for to the bell boy did not necessarily destroy the relevancy of the testimony.

3. Defendant complains of the admission of the testimony before referred to respecting the bad reputation of the house detective as related to prostitution. The testimony came about in this way: To sustain the character of the hotel, defendant's counsel had shown, on cross-examination of one of the vice squad officers, that several months after the transaction in question the hotel manager, on complaint being made that the house detective was not doing his duty in keeping out undesirable characters, had discharged the detective. The criticized testimony was thereupon introduced against a general objection whose ground was not stated, and which thus disentitles defendant to a review of the ruling as matter of right. Robinson v. Van Hooser (C. C. A. 6) 196 Fed. 620, 625, 116 C. C. A. 294. And we do not think the error, if any, in admitting the criticized testimony was so plain, or the case such as to justify a reversal on that account.

There seems much force in the consideration that in view of the cross-examination referred to it became competent to show that at the very time in question the detective had the reputation of, and was living a life such as to indicate that he was pandering. It is difficult to conceive of a hotel officer or employé, whose character in the respect mentioned would presumably be more significant than that of the house detective, in giving to the hotel a character in the respect involved here. It is true that the evidence does not in terms state that the house detective's reputation was general, or that it existed at the

very date of the transaction in question; but the natural implication would be that it was intended to relate to that time, and if the objection was that it was not general (as is not suggested here) it should have been so stated.

The judgment of the District Court must be affirmed.