

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GROVER SELLERS
ATTORNEY GENERAL

orable D. C. Greer
ate Highway Engineer
stin, Texas

ar Sir:

Opinion No. O-6921

Re: If Highway Department raises its
level of Highway grade so as to
flood damage railroad company's
tracks and roadbed, necessitating
the railway company's raising its
roadbed and tracks to conform to
the level of highway, is the State
of Texas legally liable therefor?--
And a related question.

We are in receipt of your recent request for an opinion
of this department on the above-stated matters. We quote from your
letter of request as follows:

"North of Virginia Point, in the vicinity of the
Galveston Wye, on U.S. 75, we have raised the grade of
the Highway to within about 1700 feet of the Wye from
an elevation of approximately 5.5 feet to 8.7 feet. In
1943 we proposed to raise the grade from the end of
this project to about 3000 feet North of the Wye from
an elevation of about 5.5 feet to 8.7 feet, but upon
the protest of the G.H.&.N. and S.P. Railroads, the
grade was raised only 7 feet instead of 8.7 feet. A
pencil sketch showing the location of the section of
highway involved as well as the railroad location is
attached hereto for your better understanding of the
problem.

"It is contended by the railroads that the rais-
ing of the grade of our highway resulted in the entrap-
ping of water from storm tides, and impeded their return
to the bays to such extent that their tracks, which are
at a minimum elevation of 6.3 feet (base of rail), are
inundated after storms for considerably longer periods
than was the case when the elevation of the highway was
approximately the same as the base of rail elevation.

MUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

norable D. C. Greer, page 2

"All engineers in the Department who have made observations and studies of this situation are in agreement that,

"1. The area of the openings below the base of rail elevation has been reduced to such an extent that the tracks will be under water for considerably longer periods than was the case prior to the inauguration of the above project; and

"2. This condition has delayed, and can be expected to hamper and delay operations of the railroad companies after storms, and by means of longer inundation, increase the damage to their embankment and ballast.

"Both railroads first sought redress in the form of increasing openings through our embankment and raising their grade lines to match ours. They have finally agreed, however, to accept having their grade lines raised to elevation of 7.5 feet (base of rail). The latter scheme is much less expensive than providing the additional openings. Engineers of the Public Roads Administration have agreed to participate with this Department in paying the cost of raising these railroad grades.

"Under the facts as herein above outlined, will you please advise us

"1. What the liability of this Department is for additional or aggravated damages which may result to the railroads by reason of our raises in grade; and

"2. The propriety, as well as the legal authority of this Department to perform work on the railroad right of way which is purely non-highway in character."

It is well settled that the designation, location, relocation, construction, reconstruction and maintenance of highways by the State Highway Department of Texas, an administrative State agency, is a governmental function. Robbins vs. Limestone County, 268 S. W. 915; Heathman vs. Singletary, 12 S. W. (2d) 150; Brooks vs. State, 68 S. W. (2d) 534; Martin vs. State, 88 S. W. (2d) 131; Buchanan vs. State, 89 S. W. (2d) 239; Powell vs. State of Texas, 118 S. W. (2d) 960.

The case of M. K. & T. Ry. Co. vs. Rockwall County Levee District, Vol. 297 S. W., page 206 et seq, Supreme Court of Texas, by Judge Ocie Speer, was a condemnation suit brought by Rockwall County Levee Improvement District No. 3 against the Katy Railroad, the facts of which are very voluminous. It is quite similar in principle to the factual situation with which you are confronted. It is unnecessary to state the facts of that case, since it is available, except to say that it <u>involved</u> the actual taking of a portion of the Railroad Company's embankment and roadbed by the Levee District, and <u>consequential damages due to the necessity of raising its roadbed to conform to the levee built by the district,</u> estimated at $275,000.00. The value of that portion of the roadbed actually taken by the Levee District was approximately $2,000.00. The Supreme Court held <u>that the latter amount, that is, compensation for the property actually taken, was all the damages to which the railway company was entitled; that the consequential damages due to raising the height of the company's embankment were not recoverable outlays under the Constitution.</u> This Katy Railroad Case is referred to with approval of Chief Justice Cureton, Supreme Court of Texas, in C. R. I. & G. Ry. Co. vs. Tarrant County Water Control Improvement District No. 1, 73 S. W. (2d) 55, on subsequent appeal 76 S. W. (2d) 147, certiorari denied by U. S. Supreme Court, 295 U. S. 762. This latter case was also a condemnation suit by a Water Control Improvement District and quite similar in principle to the Katy Case. The Rock Island Case was in the Supreme Court the first time on certified questions. In this case, C. R. I. & G. Ry. Co. vs. Tarrant Water Improvement District, referred to herein as the "Rock Island Case", and in which case the question was raised as to make inquiry under what circumstances, if any, would the State or political subdivision be liable to compensate a property owner for consequential loss occasioned by the exercise of the police power, Justice Cureton quotes Judge Cooley for the general rule and principle on the question as follows:

". . . As to the general principle involved, Judge Cooley declares:

"'Any proper exercise of the powers of government, which does not directly encroach upon the property of an individual, or disturb him in its possession or enjoyment, will not entitle him to compensation, or give him a right of action. ("<u>Incidental damages to property resulting from governmental activities, or laws passed in the promotion of the public welfare, are not considered a taking of the property for which compensation must be made.</u>") If, for instance, the State, under its power to provide and regulate the public highways, should authorize the construction of a bridge

across a navigable river, it is quite possible that all proprietary interest in land upon the river might be injuriously affected; but such injury could no more give a valid claim against the State for damages, than could any change in the general laws of the State, which, while keeping in view the general good, might injuriously affect particular interests. So if by the erection of a dam in order to improve navigation the owner of a fishery finds it diminished in value, or if by deepening the channel of a river to improve the navigation a spring is destroyed, or by a change in the grade of a city street the value of adjacent lots is diminished, in these and similar cases the law affords no redress for the injury.' (Italics ours.)"

Justice Cureton in Rock Island Case continues:

"It is true that under our constitutional provision (section 17 of the Bill of Rights), contrary to Judge Cooley's text, we do permit recoveries by the citizen for damages consequent upon changing street and highway grades. 16 Texas Jur. p. 900, § 242, p. 902, § 243, and cases cited in notes; Cooper v. City of Dallas, 83 Tex. 239, 18 S. W. 565, 29 Am. St. Rep. 645; Hart Bros. v. Dallas County (Tex. Com. App.) 279 S. W. 1111; Dallas County v. Barr (Tex. Civ. App.) 231 S. W. 453. The rule, however, stated by Judge Cooley, in this respect, has not been abrogated as to railroad corporations. Houston & T. C. R. Co. v. Dallas, 98 Tex. 396, 84 S. W. 648, 70 L. R. A. 850; Gulf, C. & S. F. Ry. Co. v. Milam County, 90 Tex. 355, 38 S. W. 747.

"In the case of Chicago, M. & St. P. Ry. Co. v. Minneapolis just cited, the Supreme Court of Minnesota stated:

"'The railway company constructed and placed its rails on a 16-foot embankment along a strip of land 600 feet wide separating two navigable lakes, confining a natural water course between the lakes in a pipe through such embankment. The company, by such construction, did not acquire such a property right in maintaining its tracks on the embankment that it is

entitled to compensation for the cost of a necessary
bridge to carry its tracks over a public way thereaft-
er duly established across its right of way.  The pub-
lic right to lay out such way, though asserted sub-
sequent in time to the construction of the road, is
so far the prior and superior right that the company
is required to make such reasonable readjustment of
its tracks as is necessary to permit of the safe and
convenient use of the public way.  The requirement of
such readjustment is not a taking or injuring of prop-
erty, but rests on the exercise of the reserved or
police power of the state.  The proposed way is made
up of a water way and walks on each side.  The water
way takes the place of the existing natural water
course, and becomes, like the lakes it connects, pub-
lic navigable water.  A bridge to carry the railway
tracks over this way is a necessary incident of its
use by the public, and is required by public conven-
ience and welfare. * * *

   "'Under modern conditions railway companies are
pioneers in development.  Railroads are constructed
usually in advance of the public ways and improve-
ments made necessary by subsequent settlements.  The
railroad is thus first constructed making provision
for existing land and water ways, but without refer-
ence to subsequent improvements.  By such construction
natural conditions are changed.  Solid embankments may
be erected across low lands, or deep cuts made through
higher lands.  But it is now clearly established in
this state, as in most states, that the company so
builds its road subject to the reserved right of the
public to lay out highways, locate drains, or estab-
lish or improve water ways across the company's right
of way when the necessity therefor arises.  For the
property taken in making such improvements compensa-
tion must be made, but for the incidental expense in
making reasonable changes in the method of carrying
its tracks over such improvements, when public safety,
health, convenience, or welfare require such change,
no compensation can be claimed by the railway.  Such
change is required under the reserved or police power
of the state.'  115 Minn. 460, 133 N. W. 169, 174, 51
L. R. A. (N. S.) 236, Ann. Cas. 1912D,1029 (Italics
ours.)

"This case was affirmed by the Supreme Court of
the United States. Id., 232 U. S. 430, 34 S. Ct. 400,
58 L. Ed. 671.

"In Minnesota the reserved right of the state to
require the construction there in issue by the company
at its own expense was read into the charter and fran-
chise of the company by virtue of the police power un-
der the common law. The instant case is much stronger,
for here we have a statute which defines the duty and
makes the obligation of restoration a part of the ap-
pellant's franchise, not only as a corporation, but of
its right to 'cross' or build 'along' or 'upon' the
streams involved at all. Other states operating only
under the common law as to the police power announce
the same rule. Illinois is one of these states. In
the case of C., B. & Q. R. Co. v. Illinois, 200 U. S.
561, 26 S. Ct. 341, 345, 50 L. Ed. 597, 4 Ann. Cas.
1175, the Supreme Court of the United States, in an
opinion by Associate Justice Harlan, stated the issues
as follows:

"'The contention of the railway company is that,
as its present bridge was lawfully constructed, under
its general corporate power to build, construct, oper-
ate, and maintain a railroad in the county and township
aforesaid, and as the depth and width of the channel
under it were sufficient, at the time, to carry off
the water of the creek as it then flowed, and now
flows,--the foundation of the bridge cannot be removed
and its use of the bridge disturbed unless compensation
be first made or secured to it in such amount as will
be sufficient to meet the expense of removing the tim-
bers and stones from the creek and of constructing a
new bridge of such length and with such opening under
it as the plan of the commissioners requires. The com-
pany insists that to require it to meet these expenses
out of its own funds will be, within the meaning of the
Constitution, a taking of its property for public use
without compensation, and, therefore, without due pro-
cess of law, as well as a denial to it of the equal
protection of the laws.'

"He then said:

"'But the railway company, in effect, if not in
words, insists that the rights which it asserts in this

case are superior and paramount to any that the public has to use the water course in question for the purpose of draining the lands in its vicinity, although such water course was in existence, for the benefit of the public, long before the railway company constructed its bridge. This contention cannot, however, be sustained, except upon the theory that the acquisition by the railway company of a right of way through the lands in question, and the construction on that right of way of a bridge across Rob Roy creek at the point in question, carried with it a surrender by the state of its power, by appropriate agencies, to provide for such use of that natural water course as might subsequently become necessary or proper for the public interests. If the state could part with such power, held in trust for the public--which is by no means admitted,--it has not done so in any statute, either by express words or by necessary implication. When the railway company laid the foundations of its bridge in Rob Roy creek, it did so subject to the rights of the public in the use of that water course, and also subject to the possibility that new circumstances and future public necessities might, in the judgment of the state, reasonably require a material change in the methods used in crossing the creek with cars. It may be--and we take it to be true--that the opening under the bridge as originally constructed was sufficient to pass all the water then or now flowing through the creek. But the duty of the company, implied in law, was to maintain an opening under the bridge that would be adequate and effectual for such an increase in the volume of water as might result from lawful, reasonable regulations established by appropriate public authority from time to time for the drainage of lands on either side of the creek. Angell, Water Courses (6th Ed.) § 465b, p. 640. * * *

"'"The great weight of authority is, that where there is a natural water way, or where a highway already exists and is crossed by a railroad company under its general license to build a railroad, and without any specific grant by the legislative authority to obstruct the highway or water way, the railroad company is bound to make and keep its crossing, at its own expense, in such condition as shall meet all the reasonable requirements of the public as the changed

conditions and increased use may demand." * * *

"'If the injury complained of is only incidental
to the legitimate exercise of governmental powers for
the public good, then there is no taking of property
for the public use, and a right to compensation, on
account of such injury, does not attach under the Con-
stitution. Such is the present case. * * *

"'Without further discussion, we hold it to be
the duty of the railway company, at its own expense,
to remove from the creek the present bridge, culvert,
timbers, and stones placed there by it, and also (un-
less it abandons or surrenders its right to cross the
creek at or in the vicinity of the present crossing)
to erect at its own expense and maintain a new bridge
for crossing that will conform to the regulations es-
tablished by the drainage commissioners, under the au-
thority of the state; and such a requirement if en-
forced will not amount to a taking of private prop-
erty for public use within the meaning of the Consti-
tution, nor to a denial of the equal protection of the
laws.' (Italics ours.)"

"(12)  It is quite elementary that, although the
Constitution provides for compensation for property
damaged or destroyed, it does not require compensa-
tion to be paid in all cases for consequential loss
occasioned by the exercise of the police power.  16
Tex. Jur. pp. 870, 871, §§ 221, 222; Houston & T. C.
R. Co. v. Dallas, 98 Tex. 396, 84 S. W. 648, 70 L. R.
A. 850; Gulf, C. & S. F. Ry. Co. v. Milam County, 90
Tex. 355, 38 S. W. 747; Cooley's Const. Lim. (8th Ed.),
vol. 2, p. 1149."

"(16)  The authorities also appear to be uniform
in holding that consequential damages  incident to
navigation improvements must be borne by the party
affected, and not by the government. Mills v. U. S.
(D. C.) 46 F. 738, 12 L. R. A. 673: Union Bridge Co.
v. U. S., 204 U. S. 364, 399, 27 S. Ct. 367, 51 L. Ed.
523; Monongahela Bridge Co. v. U. S., 216 U. S. 177,
193, 30 S. Ct. 356, 54 L. Ed. 435; 27 R. C. L. p. 1331,
§ 239; 45 Corpus Juris, p. 424, §§ 23, 24, 25; p. 492,
§ 143; 20 Corpus Juris, p. 681, § 145."

"(17)  On the whole, therefore, we conclude that, while the appellee is responsible in damages for so much of the appellant's line as it actually takes, it is not liable for the cost of raising appellant's railway line and bridges above the submergence or flood lines of Bridgeport Lake, nor for the cost of relocating and rebuilding the railroad around the lake as illustrated on the map (Exhibit B)."

By virtue of the holdings and reasoning in the above Rock Island and Katy Cases and the authorities therein cited, we answer your question No. 1 in the negative, that is to say, that there is no legal liability of the State of Texas for damages to the Railway Company upon the facts submitted.

Inasmuch as we have answered your number 1 question in the negative, and since we are assuming that you asked question No. 2 in anticipation of a possible affirmative answer to question No. 1, we deem it unnecessary to categorically answer this latter question.

Trusting this satisfactorily answers your inquiry, we are

Yours very truly

ATTORNEY GENERAL OF TEXAS

By

Joe McCasland
Assistant

JMcC/JCP